**Josiah L. HOOHULI, et al., Plaintiffs-Appellants,**

v.

**George ARIYOSHI, et al., Defendants-Appellees.**

No. 83–1772.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 15, 1983.

Decided Aug. 30, 1984.

Mitsuo Uyehara, Honolulu, Hawaii, for plaintiffs-appellants.

Charlotte E. Libman, Honolulu, Hawaii, for defendants-appellees.

Before TIMBERS,* WALLACE, and SKOPIL, Circuit Judges.

SKOPIL, Circuit Judge:

■ The district court dismissed plaintiffs' complaint [1] for lack of jurisdiction on under section 1291 unless circumstances make it clear that the court concluded that the action could not be saved by any amendment of the complaint. *Scott v. Eversole Mortuary,* 522 F.2d 1110, 1112 (9th Cir.1975) (because the district court did not allow leave to amend, it must have determined that the action would not be saved by amendment). If it appears that the district court intended the dismissal to dispose of the action, it may be considered final and appealable. *See Scanlon v. Atascadero State Hospital,* 677 F.2d 1271, 1272 (9th Cir.1982).

Defendants' motion to dismiss was titled "Motion to Dismiss Complaint." Despite this, and the court's characterization of its order, we conclude that the district court intended to dispose of the action. The dismissal did not grant leave to amend, *see Scott,* 522 F.2d at 1112, and the orders from which plaintiffs' appeal were based

---

* The Honorable William H. Timbers, Senior Judge for the United States Court of Appeals for the Second Circuit.

1. Jurisdiction in this court is based on 28 U.S.C. § 1291. The orders from which plaintiffs appeal are the order of September 25, 1981 granting defendants' motion to dismiss the complaint, and the order of February 7, 1983 denying plaintiffs' motion for reconsideration of the 1981 order. Because the district court characterized the September 25th order as one dismissing the complaint, the question arises whether it is final and appealable. We are obligated to determine *sua sponte* the finality of the order on appeal. *In re Exennium, Inc.,* 715 F.2d 1401, 1402 (9th Cir.1983).

Ordinarily an order dismissing a complaint but not dismissing the action is not appealable

the ground that the eleventh amendment barred the relief requested. In ruling on a motion for reconsideration, the court alternatively held that principles of qualified immunity shielded the defendants. We affirm in part and reverse in part.

## FACTS AND PROCEEDINGS BELOW

Appellants are eleven residents [2] of the State of Hawaii and a tax-payers' advocacy group known as the Tax Payers Union. They brought this action under 42 U.S.C. § 1983 and the fourteenth amendment to the United States Constitution alleging unlawful discrimination. Appellants claim injury as a result of a system established by the State of Hawaii to disburse benefits to residents who have descended from the aboriginal inhabitants of the islands.

The benefits program complained of had its genesis in 1978 when the Hawaii electorate approved an amendment to the Constitution of the State of Hawaii. Hawaii Const. art. XII. To implement Article XII, the state legislature established the Office of Hawaiian Affairs ("OHA") for the purpose of addressing the needs of residents who are descendants of the original occupants of the islands. *See* Hawaii Rev.Stat. Ch. 10.

Consistent with Article XII, the legislature defined two distinct classes of people to benefit from the programs: [3]

"Hawaiian" means any descendant of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and subsisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii;

"Native Hawaiian" means any descendant of not less than one-half part of the races inhabiting the Hawaiian Islands

previous to 1778, ... and which peoples thereafter continued to reside in Hawaii. Hawaii Rev.Stat. §§ 10-2(4) and (5). "Hawaiians," then, are persons of any percentage descent from the original inhabitants. "Native Hawaiians" are those of 50% or more descent. Nine of the individual plaintiffs in this case are alleged to be "native Hawaiians." The remaining two individual plaintiffs are neither "Hawaiians" nor "native Hawaiians."

Plaintiffs alleged injury in their capacity as taxpayers. They complained that their tax dollars were being spent on a program which disbursed benefits based on impermissible racial classifications. They argued that the classification "Hawaiian" set forth in section 10-2(4) and disbursement of benefits based on that classification violated the privileges and immunities, due process and equal protection provisions of the fourteenth amendment, as well as 42 U.S.C. § 1983. They did not argue that "Native Hawaiian" is an impermissible classification. Plaintiffs asked for an injunction to prevent the defendants from spending tax monies from the state general fund for the benefit of the racial class "Hawaiians." Plaintiffs also asked for an accounting, to be followed by an order against the defendants, all of whom are state officials, requiring them to pay back into the state treasury from their own pockets any money that may have already been spent on "Hawaiians." Plaintiffs also requested costs and attorney fees.

On September 25, 1981 the district court granted the defendants' motion to dismiss. The court ruled that the action was, in essence, against the State of Hawaii, and that a state is not a "person" within the meaning of 42 U.S.C. § 1983. The court also ruled that the complaint failed to make

---

on grounds that could not be affected by amendment. Jurisdiction in this court is therefore proper under section 1291.

**2.** The complaint also alleged this action was brought on behalf of other persons similarly situated in the State of Hawaii. The district court did not reach the question of class certification under Fed.R.Civ.P. 23(b)(2) before dismissing the case.

**3.** The portion of Article XII defining the classes of beneficiaries of OHA programs was held to be not validly ratified in *Kahalekai v. Doi,* 60 Haw. 324, 590 P.2d 543 (1979). The challenge in this case is to the implementing legislation which defined the same groups of beneficiaries as the failed constitutional provision.

out any other justiciable claim, and dismissed for lack of jurisdiction. Upon plaintiffs' motion for reconsideration, the district court acknowledged that the complaint did state a claim for violation of the fourteenth amendment. The court denied the motion, however, because it adhered to its earlier view that the action was essentially against the state and not the individually named defendants. With regard to plaintiffs' prayer for monetary relief, the court found it "undoubtedly true that the state is the entity with ultimate responsibility for the funding." Because the district court was persuaded that the state was the real party in interest, it also ruled that injunctive relief was barred by the eleventh amendment. The district court ruled in the alternative that, even if the complaint be read as against the named defendants and not the state, the action was barred by the doctrine of qualified immunity.

Plaintiffs appealed.

## ISSUES

1. Is this action barred by the eleventh amendment?

2. Are defendants shielded by the doctrine of qualified immunity?

3. Do the Tax Injunction Act or principles of comity bar this action?

4. Do plaintiffs have standing as taxpayers?

## DISCUSSION

■ Our review of a dismissal for lack of subject matter jurisdiction is *de novo.*

4. One school of thought proposes that the eleventh amendment has been wrongly interpreted, and was intended only to prohibit federal courts hearing claims by citizens against a state where the only basis for jurisdiction is diversity of citizenship of the parties. *See* J. Gibbons, *The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation,* 83 Columbia L.Rev. 1889 (1983). While the cited article provides a thought provoking analysis, no court has adopted a similar view.

5. Sovereign immunity may be waived, *e.g., Clark v. Barnard,* 108 U.S. 436, 447, 2 S.Ct. 878, 882, 27 L.Ed. 780 (1883), provided the state's consent to suit is clear and unequivocal. *See,*

*Societe de Conditionnement v. Hunter Engineering Co., Inc.,* 655 F.2d 938, 941 (9th Cir.1981).

1. *Eleventh Amendment*

The eleventh amendment provides:

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

■ The Supreme Court has recognized that the amendment reflects the fundamental principle of sovereign immunity as a limitation on the grant of judicial authority in Article III. *E.g., Ex parte State of New York No. 1,* 256 U.S. 490, 497, 41 S.Ct. 588, 589, 65 L.Ed. 1057 (1921). Thus, despite the limited terms of the amendment, federal courts cannot entertain an action brought by a citizen against his or her own state. *E.g., Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).[4] Absent consent by the state or abrogation by Congress,[5] an action in which the state is the named defendant is prohibited by the eleventh amendment. *See, e.g., Florida Department of Health v. Florida Nursing Home Association,* 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981); *Alabama v. Pugh,* 438 U.S. 781, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978).

■ An important exception to this general rule was recognized in *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). There, the Supreme Court held that the eleventh amendment did not bar

*e.g., Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974); *Department of Education, State of Hawaii v. Katherine D.,* 727 F.2d 809, 818–819 (9th Cir.1984) (amended opinion). The eleventh amendment bar may also be overcome by a clear expression of congressional intent to abrogate the immunity granted. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976); *cf. Quern v. Jordan,* 440 U.S. 332, 342, 99 S.Ct. 1139, 1145, 59 L.Ed.2d 358 (1979) (42 U.S.C. § 1983 is not a clear expression of intent to abrogate). Neither exception applies to this case.

the federal courts from enjoining a state official from enforcing a state statute which allegedly violated the fourteenth amendment. *Id.* at 155–58, 28 S.Ct. at 452–53. Under the theory of *Young*, an action against a state official is not one against the state. The eleventh amendment is thereby avoided. *See Pennhurst State School and Hospital v. Halderman,* —— U.S. ——, 104 S.Ct. 900, 908–09, 79 L.Ed.2d 67 (1984). "[T]he *Young* doctrine has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Id.* 104 S.Ct. at 910, *quoting Young,* 209 U.S. at 160, 28 S.Ct. at 454; *see, e.g., Quern v. Jordan,* 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979); *Scheuer v. Rhodes,* 416 U.S. 232, 237, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

The *Young* exception is only applicable, however, where prospective relief is sought. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). In *Edelman,* appellants sought an injunction as well as damages. The Court held that injunctive relief was proper but the monetary relief, as a form of retroactive relief, was not. *Id.* at 664–65, 94 S.Ct. at 1356–57. *Edelman* represents an effort to balance the immunity of the states with the need to fulfill the underlying purpose of *Ex parte Young. See Pennhurst,* 104 S.Ct. at 910–11. Because *Edelman* reminds us that not all forms of relief are permitted, we must determine whether any of the forms requested by plaintiffs are barred.

■ We find that the *Young* exception to the eleventh amendment is applicable to this case. The named defendants are all state officials rather than the state or its agencies. The complaint alleges violations

of the fourteenth amendment directly and through section 1983. Clearly the requested injunction is not barred by the eleventh amendment.[6] *See, e.g., Edelman,* 415 U.S. at 664, 94 S.Ct. at 1356; *Ex parte Young,* 209 U.S. at 155–58, 28 S.Ct. at 452–53.

■ We have more difficulty with plaintiffs' requests for an accounting and repayment. The district court was of the view that the relief requested would ultimately be paid by the state. Were that true, of course, such relief would be barred. A suit seeking to impose a liability which ultimately must be paid by the state is barred by the eleventh amendment. *Edelman,* 415 U.S. at 663–68, 94 S.Ct. at 1355–58; *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945); *cf. Goodisman v. Lytle,* 724 F.2d 818, 820 (9th Cir.1984) (award of prospective relief that requires ancillary payment from state treasury is not barred).

■ We need not decide if the monetary relief requested would inevitably be paid out of funds from the State Treasury. The request for relief is barred for a different reason. We find that plaintiffs, by requesting repayment to the state rather than damages for themselves, are seeking to protect the interests of the state. Plaintiffs lack standing to assert the interests of the state.

"[A] general standing limitation imposed by federal courts is that a litigant will ordinarily not be permitted to assert the rights of absent third parties." *Flast v. Cohen,* 392 U.S. 83, 99 n. 20, 88 S.Ct. 1942, 1952 n. 20, 20 L.Ed.2d 947 (1968); *see, e.g., Heald v. District of Columbia,* 259 U.S. 114, 123, 42 S.Ct. 434, 435, 66 L.Ed. 852 (1922). "[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal

---

6. The nature of the relief requested is not always dispositive, of course. A suit against a state official that is in fact against a state, is barred even if the relief sought is injunctive. *Cory v. White,* 457 U.S. 85, 90–91, 102 S.Ct. 2325, 2328–29, 72 L.Ed.2d 694 (1982).

Defendants' contention that *Cory* established a bar to injunctive relief against state officials under the eleventh amendment is without merit.

"That case held that suit to restrain actions of state officials can be prosecuted if those actions are without authority of state law or violate federal law." *Goodisman v. Lytle,* 724 F.2d 818, 820 (9th Cir.1984). Because plaintiffs in this case allege violations of federal constitutional and statutory law, *Cory* does not bar equitable relief. *Id.*

rights or interests of third parties." *Valley Forge Christian College v. Americans United*, 454 U.S. 464, 474, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982), *quoting Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The repayment requested is predicated on an injury, if it can be called that, to the state. The prudential limitations on standing in federal tribunals counsel against entertaining such requests. We therefore affirm the district court's dismissal of plaintiffs' claim for repayment relief.

■ Having so decided, we need not long consider the request for an accounting. The accounting sought is intended to quantify the amounts spent to further the interests of "Hawaiians." Such quantification is for the sole purpose of establishing the amount which plaintiffs would have state officials repay to the state treasury. The request for an accounting is in essence a part of the request for repayment. Because we hold that plaintiffs have no standing to seek repayment to the state, we likewise hold that they may not seek an accounting.

## 2. *Qualified Immunity*

■ The district court relied on principles of qualified immunity as set forth in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) as an alternative basis for its dismissal. We find the court's reliance misplaced.

In *Harlow*, the Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."

**7.** To the extent plaintiffs' prayer for repayment to the State Treasury can be considered one for damages, we have held today they are without standing to assert it. We therefore need only address whether the principles of immunity affect the availability of injunctive relief.

**8.** Similarly, *see Spalding v. Vilas*, 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896).

*Id.* at 818, 102 S.Ct. at 2738. The Court expressed no view as to the conditions under which injunctive relief might be available. *Id.* at 819 n. 34, 102 S.Ct. at 2739 n. 34.

Unlike *Harlow*, this case properly presents only a claim for injunctive relief.[7] Prior to *Harlow*, it was the rule in this circuit that claims for injunctive relief in section 1983 actions were not barred by principles of qualified immunity. *Stanford Daily v. Zurcher*, 550 F.2d 464, 465 (9th Cir.1977), *rev'd on other grounds*, 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978); *accord Rowley v. McMillan*, 502 F.2d 1326, 1332 (4th Cir.1974). Upon review of the policy justifications supporting the decision in *Harlow*, we conclude that immunity from injunctive relief is generally without foundation.

In *Scheuer v. Rhodes*, the Supreme Court considered whether state officials were immune from personal liability under section 1983. In deciding that such officials are entitled to qualified immunity, the Court noted that early common law

> recognized the necessity of permitting officials to perform their official functions free from the threat of suits for personal liability. This official immunity apparently rested, in its genesis, on two mutually dependent rationales: (1) the injustice ... of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good.

*Scheuer*, 416 U.S. at 239–40, 94 S.Ct. at 1688.[8] *See also id.* at n. 4.

> In exercising the functions of this office, [an official] ... should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs as entrusted to the executive branch of the government, if he were subjected to any such restraint.

The essence of these concerns is that, given human nature, government officials confronted with difficult problems would hesitate and react with indecision when faced with personal liability for their errors. The public would thereby be deprived of responsive government able to act quickly when decisiveness is most needed. As the Court said in *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), such liability "would contribute not to principled and fearless decisionmaking but to intimidation." *Id.* at 554, 87 S.Ct. at 1218.

A second and related concern was expressed by the Court in *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). That case involved a claim that school board members had violated the constitutional rights of students by suspending them from school without due process. In discussing the need for qualified immunity, the Court said: "The most capable candidates for school board positions might be deterred from seeking office if heavy burdens upon their private resources from monetary liability were a likely prospect during their tenure." *Id.* at 320, 95 S.Ct. at 1000. The same can be said for nearly every government position. All but the most fearless, or foolish, would be reluctant to participate in public service in the absence of some type of immunity from personal damages liability.

These justifications for the creation of immunity from damages liability are notably absent when the relief sought is an injunction halting the implementation of a governmental program. While government officials might experience frustration and annoyance, it is unlikely that the possibility of injunctions will deter officials from the decisive exercise of their duties. Similarly, we doubt that anyone would avoid public service because he or she might be subject to an injunction affecting the exercise of the authority of a public office.

▪ We find no persuasive justifications for creation of immunity, qualified or otherwise, from injunctions against the further exercise of authority under an allegedly unconstitutional statute. In considering the application of principles of immunity, the Court has specifically recognized that "immunity from damages does not ordinarily bar equitable relief as well." *Wood v. Strickland*, 420 U.S. at 315 n. 6, 95 S.Ct. at 997 n. 6 (complaint sought damages and injunctive relief; Court held officials immune from damages action but remanded for consideration of merits of request for injunction). The availability of such injunctive relief is necessary to permit the vindication of important federal rights. We therefore hold that state officials are not protected by principles of immunity from actions seeking injunctions limiting the exercise of authority under a state statute that is allegedly unconstitutional.[9] Any other rule would eviscerate the *Young* doctrine and diminish the protections of the Bill of Rights.

### 3. *Tax Injunction Act; Comity*

#### A. Tax Injunction Act.

▪ The Tax Injunction Act, 28 U.S.C. § 1341 ("Act") is a jurisdictional limitation on the federal courts. *E.g., Moe v. Confederated Salish and Kootenai Tribes*, 425 U.S. 463, 470, 96 S.Ct. 1634, 1639–40, 48 L.Ed.2d 96 (1976); *Marvin F. Poer and Co. v. Counties of Alameda*, 725 F.2d 1234, 1235 (9th Cir.1984). We are required to raise jurisdictional issues *sua sponte*. *See City of Kenosha v. Bruno*, 412 U.S. 507, 511, 93 S.Ct. 2222, 2225, 37 L.Ed.2d 109 (1973); *Washington Local v. International Brotherhood of Boilermakers*, 621 F.2d 1032, 1033 (9th Cir.1980).

After the Supreme Court decided in *Ex parte Young* that federal courts may enjoin state officers from enforcing unconstitutional state laws, "Congress ... recognized that the autonomy and fiscal stability of the States survive best when state tax systems are not subject to scrutiny in federal courts." *Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100, 102–03, 102 S.Ct. 177, 179, 70 L.Ed.2d 271

---

**9.** We express no opinion with regard to other forms of injunctive relief.

(1981). Thus, Congress provided that: "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341.

■ We conclude that the Act has no application to this case. Though this action involves a request for an injunction, the requested relief would not "enjoin, suspend or restrain the assessment, levy or collection" of a state tax. *Id.* Rather, the requested relief is directed at a *spending* program of the State of Hawaii. We know of no case which has applied the Act to limit federal court jurisdiction to enjoin state revenue spending. The scarcity of such cases is not surprising, based on the language of the Act which is explicitly aimed at the revenue producing side of state fiscal operations.

"[T]his legislation was first and foremost a vehicle to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." *Rosewell v. LaSalle National Bank,* 450 U.S. 503, 522, 101 S.Ct. 1221, 1234, 67 L.Ed.2d 464 (1981). The Supreme Court recently cited with approval Justice Brennan's explanation for the deference to state taxing programs expressed in the Act:

> If federal declaratory relief were available to test state tax assessments, state tax administration might be thrown into disarray, and taxpayers might escape the ordinary procedural requirements imposed by state law. During the pendency of the federal suit the collection of revenue under the challenged law might be obstructed, with consequent damage to the State's budget, and perhaps a shift to the State of the risk of taxpayer insolvency.

*McNary,* 454 U.S. at 108 n. 6, 102 S.Ct. at 182 n. 6, *quoting Perez v. Ledesma,* 401 U.S. 82, 128 n. 17, 91 S.Ct. 674, 698 n. 17, 27 L.Ed.2d 701 (1971) (Brennan, J., concurring in part and dissenting in part). Certainly none of these ill effects can result

from a federal court's scrutiny of state spending programs. We therefore hold the Tax Injunction Act does not apply to this case.

**B. Comity.**

Prior to argument we requested the parties to address whether *McNary* has any impact on this case. Our review of that decision indicates it does not.

■ The issue in *McNary* was whether federal courts could entertain an action for damages resulting from an allegedly unconstitutional tax assessment scheme. The Supreme Court ruled that comity, based on concerns of federalism, barred such damages actions. *Id.* at 116, 102 S.Ct. at 186. Implicit in the court's discussion is the conclusion that comity, to the extent it affects actions seeking injunctions, is embodied in the Tax Injunction Act, 28 U.S.C. § 1341. The *McNary* Court developed a rule that parallels the Act for application to actions for damages. *See McNary,* 454 U.S. at 116, 102 S.Ct. at 186.

Because we have ruled that this case is properly only one for injunctive relief, we hold that it is not controlled by *McNary,* but instead by the Tax Injunction Act. We have held today that the Act does not deprive federal courts from providing relief from allegedly unconstitutional state spending programs.

*4. Standing*

■ Though the issue was raised, the district court did not base its dismissal on a lack of standing. The defendants urge us to affirm the district court on the basis that plaintiffs lack standing to bring this action. We may affirm the district court on any basis fairly supported by the record. *Goodisman v. Lytle,* 724 F.2d at 820; *United States v. 101.80 Acres of Land,* 716 F.2d 714, 727 n. 24 (9th Cir.1983).

In the area of taxpayer standing; *Frothingham v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), is the starting point for analysis. The taxpayer in *Frothingham* attacked the Maternity Act of

1921, which established a federal program of grants to states to reduce maternal and infant mortality. She alleged that Congress, in enacting the challenged statute, had exceeded the powers delegated to it under Article I of the Constitution. The taxpayer complained that the result of the allegedly unconstitutional enactment would be to increase her future federal tax liability and "thereby take her property without due process of law." *Id.* at 486, 43 S.Ct. at 600. The Court denied standing, noting that a federal taxpayer's "interest in the moneys of the Treasury ... is comparatively minute and indeterminable" and that "the effect upon future taxation, of any payment out of the [Treasury's] funds, [is] remote, fluctuating and uncertain." *Id.* at 487, 43 S.Ct. at 601.

*Frothingham* did not purport to answer questions of taxpayer standing to challenge state or municipal taxing or expenditures. The Court did not discuss state taxpayer standing, but did recognize that "[t]he interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate." *Id.* at 486, 43 S.Ct. at 601.

*Frothingham* remained the touchstone for federal taxpayer standing until 1968. In the interim, *Doremus v. Board of Education,* 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952) was decided. In *Doremus,* the Court was in the middle ground between *Frothingham,* which essentially eliminated federal taxpayer standing, and the cases recognized in *Frothingham* as preserving municipal taxpayer standing. *Doremus* involved, as this case does, state taxpayers challenging state statutes.

In *Doremus,* New Jersey state taxpayers claimed that a state law that authorized public school teachers to read from the Bible violated the first amendment. The Supreme Court dismissed for lack of standing. But the failure of standing in *Doremus* was not because the plaintiff was alleging standing as a taxpayer. It was a failure of the plaintiff's pleading to set forth a taxpayer's injury. After discussing other failures of the pleadings, the Court said:

> The complaint is similarly niggardly of facts to support a taxpayer's grievance. * * * There is no allegation that this activity is supported by any separate tax or paid for from any particular appropriation or that it adds any sum whatever to the cost of conducting the school. No information is given as to what kind of taxes are paid by appellants and there is no averment that the Bible reading increases any tax they do pay or that as taxpayers they are, will, or possibly can be out of pocket because of it.
>
> * * * * * *
>
> Without disparaging the availability of the remedy by taxpayer's action to restrain unconstitutional acts which result in direct pecuniary injury, we reiterate ... [one] must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally.
>
> It is true that this Court found a justiciable controversy in *Everson v. Board of Education,* 330 U.S. 1 [67 S.Ct. 504, 91 L.Ed. 711]. But *Everson* showed a measurable appropriation or disbursement of school-district funds occasioned solely by the activities complained of. This complaint does not.

*Doremus,* 342 U.S. at 433–34, 72 S.Ct. at 397 (citations omitted).

The difference between state taxpayer standing and federal taxpayer standing at the time of *Doremus,* then, was essentially one of economic relativity. Federal taxpayers could not, as a matter of law, show sufficient injury to have standing after *Frothingham.* State taxpayers could still maintain taxpayer suits if their pleadings were sufficient. They were sufficient if they set forth the relationship between taxpayer, tax dollars, and the allegedly illegal government activity. *Doremus,* 342 U.S. at 433–34, 72 S.Ct. at 397.

Some sixteen years after *Doremus*, the Court undertook a review of *Frothingham* and the entire question of federal taxpayer standing in *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The Court determined that there was no absolute Article III constitutional bar to federal taxpayer suits. The Court then considered what circumstances created a sufficient relationship between a federal taxpayer and complained of government activity to fulfill the requirements for standing under Article III. The Court held that a federal taxpayer's challenge must be to an exercise of congressional power under the taxing and spending clause of the Constitution, and the taxpayer must allege that the challenged legislation exceeds a specific constitutional limitation on the authority of Congress to tax and spend.[10] The Court went on to find that the taxpayers satisfied both nexuses. *Id.* at 103, 88 S.Ct. at 1954.

The Court distinguished *Frothingham* by pointing out that there the taxpayer had not satisfied the second requirement of the two step nexus test:

> The allegations of taxpayer in *Frothingham v. Mellon, supra,* were quite different from those made in this case, and the result in *Frothingham* is consistent with the test of taxpayer standing announced today. The taxpayer in *Frothingham* attacked a federal spending program and she, therefore, established the first nexus required. However, she lacked standing because her constitutional attack was not based on an allegation that Congress, in enacting the Maternity Act of 1921, had breached a specific limitation upon its taxing and spending power.

*Id.* at 104–05, 88 S.Ct. at 1955.[11]

The effect of *Flast* on state taxpayer standing is not entirely clear. *Flast* cited *Doremus* with approval in connection with the first step of the federal taxpayer standing test. *See* footnote 10. *Doremus* was not discussed in connection with the second step of the nexus test. We find implicit in this a continued distinction between standing requirements for state and federal taxpayers. *Flast* does not appear to have affected the availability of standing for state taxpayers challenging state statutes.

None of the more recent Supreme Court decisions affect state taxpayer standing. Two Supreme Court decisions of the 1970's affirmed the *Flast* exception to the general

---

**10.** The nexus demanded of federal taxpayers has two aspects to it. First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. *This requirement is consistent with the limitation imposed upon state-taxpayer standing in federal courts in Doremus v. Board of Education, 342 U.S. 429 [72 S.Ct. 394, 96 L.Ed. 475] (1952).* Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8. When both nexuses are established, the litigant will have shown a taxpayer's stake in the outcome of the controversy and will be a proper and appropriate party to invoke a federal court's jurisdiction.

*Flast v. Cohen,* 392 U.S. 83, 102–03, 88 S.Ct. 1942, 1954, 20 L.Ed.2d 947 (1968) (emphasis added).

**11.** The taxpayer in *Frothingham* alleged essentially that Congress, by enacting the challenged statute, had exceeded the general powers delegated to it by Art. I, § 8, and that Congress had thereby invaded the legislative province reserved to the States by the Tenth Amendment. To be sure, Mrs. Frothingham made the additional allegation that her tax liability would be increased as a result of the allegedly unconstitutional enactment, and she framed that allegation in terms of a deprivation of property without due process of law. However, the Due Process Clause of the Fifth Amendment does not protect taxpayers against increases in tax liability, and the taxpayer in *Frothingham* failed to make any additional claim that the harm she alleged resulted from a breach by Congress of the specific constitutional limitations imposed upon an exercise of the taxing and spending power. *Flast,* 392 U.S. at 105, 88 S.Ct. at 1955.

*Frothingham* rule. Each applied with vigor the limitations on federal taxpayer standing set forth in *Flast;* neither purported to deal with state taxpayer standing. *See United States v. Richardson,* 418 U.S. 166, 174–75, 94 S.Ct. 2940, 2945–46, 41 L.Ed.2d 678 (1974) (challenge was not to the taxing or spending power of Congress but to statutes regulating the CIA); *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 228, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974) (taxpayers did not challenge congressional action under the taxing and spending power but rather an action of the executive branch). In the recent case of *Valley Forge College v. Americans United,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), the Supreme Court denied standing because the taxpayers failed the first of *Flast's* twin requirements:

> [T]he property transfer about which respondents complain was not an exercise of authority conferred by the Taxing and Spending clause of Art. I, § 8. The authorizing legislation, the Federal Property and Administrative Services Act of 1949, was an evident exercise of Congress' power under the Property Clause, Art. IV, § 3, cl. 2. Respondents do not dispute this conclusion ... and it is decisive of any claim of taxpayer standing under the *Flast* precedent.

*Id.* at 480, 102 S.Ct. at 762–63 (footnotes omitted). The holding in *Valley Forge* neither added nor detracted from the *Flast* requirements for federal taxpayer standing, and likewise did not affect the requirements of state taxpayer standing. We are thus left with *Doremus* in its original form to guide us in questions of state taxpayer standing.

In applying *Doremus* to the facts of this case we are guided by *Public Citizen, Inc. v. Simon,* 539 F.2d 211 (D.C.Cir.1976). The court in that case recognized that taxpayer standing did not depend on magnitude of injury, either at the state or federal level. The court observed that in federal taxpayer cases, once the *Flast* requirements are satisfied standing is achieved. The court compared federal and state taxpayer standing,

noting that state taxpayers could achieve standing in a broader range of circumstances than federal taxpayers:

> The impact on federal taxpayers in such cases is conceptually direct, even though the dollar-and-cents consequence for a taxpayer is minimal. The doctrine thus evolved for federal taxpayers reflects considerations similar to those developed by the Court in the "good-faith pocketbook action" limitation on state taxpayer standing in the Supreme Court.

> \* \* \* \* \* \*

> Although state taxpayers may be able to challenge executive conduct, as was the case in *Everson,* while federal taxpayers after *Richardson* and *Schlesinger* are restricted to congressional exercises of the taxing and spending power, this anomaly is a consequence of the Court's traditional differentiation between state and federal taxpayers for purposes of standing. *See, e.g., Frothingham; Doremus.* The *Flast* "nexus" test, at least its first prong, is an attempt to frame a federal equivalent for the *Doremus* "good-faith pocketbook action" limitation on state taxpayer suits.

*Public Citizen,* 539 F.2d at 218 and n. 30 (citations omitted).

We find that, with some exceptions, plaintiffs have satisfied the requirements for standing. Each of the individual plaintiffs have set forth his or her status as a taxpayer. The challenge is to the "appropriating, transferring, and spending .... of taxpayers' money from the General Fund of the State Treasury...." Plaintiffs complain that, "[b]y creating the class identified as 'Hawaiians' in the office of Hawaiian Affairs, in addition to the class 'Native Hawaiians,' taxpayers have been burdened with the necessity to provide more taxes to support said second class." The pleadings set forth with specificity amounts of money appropriated and spent for allegedly unlawful purposes. This case fits the description of a "good-faith pocketbook action" set forth in *Doremus,* 342 U.S. at 434, 72 S.Ct. at 397. We therefore hold that at least

some of the individual plaintiffs have standing as taxpayers.

■ Our reservation with regard to standing as taxpayers applies to those individual plaintiffs who are described in the pleadings as "native Hawaiians." The record indicates that those plaintiffs are beneficiaries of the programs they seek to enjoin. The fact that they receive benefits may negate any pocketbook injury they have in their role as taxpayers and thereby destroy their standing as taxpayers. We decline to rule on that issue, however, because we cannot discern from the record as it stands whether and to what extent they do benefit. It may not be necessary for the district court to rule on that issue because it appears that the native Hawaiian plaintiffs may have standing to challenge the programs in their capacity as individual native Hawaiians.

The record suggests that the programs established under chapter 10 of the Hawaiian Revised Statutes are supported in part by funds from a trust which are required to be spent exclusively for "native Hawaiians." We are uncertain, at this stage of the proceedings and from the record heretofore developed, whether the native Hawaiian plaintiffs have sustained an injury by virtue of the diversion of funds to "Hawaiians." We are likewise uncertain, based on the amended complaint, whether the native Hawaiians are asserting injury in their capacity as natives. On remand, the native Hawaiian plaintiffs should be permitted to amend their complaint to assert injury and standing as natives. The record may also require supplementation. The district court should then rule on their standing in that capacity. If the district court finds that they lack standing in that capacity, it should then consider and rule on their standing as taxpayers.

■ The Tax Payers Union is conceded not to be a taxpayer. The district court's dismissal is therefore affirmed with respect to the Tax Payers Union. Because the complaint characterizes this entirely as a taxpayers action for all but the native Hawaiian plaintiffs, we need not address

whether the Tax Payers Union could establish standing in any other capacity.

## CONCLUSION

Plaintiffs lack standing to seek the monetary relief they have requested. The request for an accounting is barred for the same reason. The eleventh amendment is not a bar to the injunctive relief requested by the plaintiffs. Principles of qualified immunity do not encompass this action for injunctive relief. Principles of comity, insofar as they apply to actions for injunctions, are embodied in the Tax Injunction Act. The Tax Injunction Act does not reach actions for relief from state spending programs.

The individual plaintiffs who are not descendents of the original island inhabitants have standing as taxpayers to bring this action. The Tax Payers Union does not have standing as a taxpayer. The remaining plaintiffs may have standing as taxpayers or may have standing as native Hawaiians. The standing of this group is to be determined on remand.

The district court is AFFIRMED in part, REVERSED in part, and REMANDED.

WALLACE, Circuit Judge, dissenting in part:

The majority sees this essentially as a taxpayers' suit and, to the extent the majority reverses, it is done upon a necessary determination of standing. I respectfully dissent from that part of the majority's analysis which concludes that "[t]he individual plaintiffs who are not descendants of the original island inhabitants have standing as taxpayers to bring this action." (Maj. op. at 1181) Although the district court did not rule on standing on the dismissal motion, the majority finds that these non-Hawaiians have established a "good-faith pocketbook action" alleging the state's unconstitutional disbursement of their tax dollars. Because I think the non-Hawaiians have not yet made out a taxpayer's injury, I would remand for initial consideration by the district judge and

to let the parties build a more substantial record.

In order to improve the social and economic welfare of all persons who descended from its original inhabitants, Hawaii legislated that certain land trusts be administered for the benefit of both "Native Hawaiians" and their descendants, "Hawaiians." The extensive political battle over the beneficial direction of these trusts has spilled over into federal court. The plaintiffs, including the non-Hawaiians in question, challenged the term "Hawaiian" as being unreasonable because it is defined without any limitation on blood quantum, i.e., "any descendants of the aboriginal peoples." Thus, they argue, any benefit program implemented to help such a class violates the Constitution. Bringing their action as taxpayers, for reasons still not wholly clear to me, the non-Hawaiians complain they "have been burdened with the necessity to provide more taxes to support said [Hawaiians]" than if the trusts applied only to "Native Hawaiians." (Maj. op. at 1180) Puzzlingly, the majority's analysis of the non-Hawaiians' standing is disposed of in one paragraph quite removed from its rather abstract case law discussion.

To identify properly the issue I raise, a more in-depth analysis will be helpful. Article III of the Constitution imposes on federal courts the jurisdictional hurdle of the "case or controversy" requirement because they "are not commissioned to roam at large, gratuitously righting perceived wrongs and vindicating claimed rights." *Orr v. Orr*, 440 U.S. 268, 290, 299, 99 S.Ct. 1102, 1122, 59 L.Ed.2d 306 (1979) (Rehnquist, J., dissenting). Article III's justiciability doctrines, like standing, assure that legal questions will be resolved "in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action," *Valley Forge Christian College v. Americans United For Separation of Church and State*, 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982) (*Valley Forge*); allocate judicial power smoothly over time, Brilmayer, *The Jurisprudence of Article III: Perspectives on the "Case or Controversy" Requirement*, 93 Harv.L.Rev. 297, 304–06 (1979); protect the self-determination interests of non-litigants, *id.* at 310–15; and "confine federal courts to a role consistent with a system of separated powers" by letting through to them only disputes "traditionally thought to be capable of resolution through the judicial process," *Flast v. Cohen*, 392 U.S. 83, 97, 88 S.Ct. 1942, 1951, 20 L.Ed.2d 947 (1968). *See also Allen v. Wright*, — U.S. —, —, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (*Allen*); *Valley Forge*, 454 U.S. at 473–74, 102 S.Ct. at 759–60; *Orr v. Orr*, 440 U.S. at 290, 99 S.Ct. at 1117 (Rehnquist, J., dissenting).

In operation, the standing doctrine "subsumes a blend of constitutional requirements and prudential considerations." *Valley Forge*, 454 U.S. at 471, 102 S.Ct. at 758. *See also Gonzales v. Gorsuch*, 688 F.2d 1263, 1268–73 (9th Cir.1982) (*Gonzales*) (Wallace, J., concurring). The "core component derived directly from the Constitution," *Allen*, — U.S. at —, 104 S.Ct. at 3325, requires that a plaintiff show "not only that the statute is invalid but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally." *Doremus v. Board of Education*, 342 U.S. 429, 434, 72 S.Ct. 394, 397, 96 L.Ed. 475 (1952) (*Doremus*), *quoting Massachusetts v. Mellon*, 262 U.S. 447, 448, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923). *See also, e.g., Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758. Prudential principles may counsel against standing even where a plaintiff establishes a sufficient article III injury-in-fact. These include "several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, [or] the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches." *Allen*, — U.S. at —, 104 S.Ct. at 3324–25. *See also Valley Forge*, 454 U.S. at

474–75, 102 S.Ct. at 759–60; *Gonzales*, 688 F.2d at 1270–71 (Wallace, J., concurring).

*Doremus* requires a state taxpayer plaintiff to demonstrate "a good-faith pocketbook action," 342 U.S. at 434, 72 S.Ct. at 397, which appears to parallel the core article III injury-in-fact requirement. *See Allen*, —— U.S. at ——, 104 S.Ct. at 3324. But when state taxpayers attack state spending in federal court, another major consideration operates: the integrity of our government's federalist structure. Unnecessary or abstract decisions by federal courts in cases where there is no case or controversy could unduly constrict experimental state welfare legislation and undermine local self-determination. The Supreme Court has often, of course, highlighted the relationship between dual federalism and federal jurisdiction. *Cf., e.g., Allen*, —— U.S. at ——, 104 S.Ct. at 3328; *Rizzo v. Goode*, 423 U.S. 362, 377–81, 96 S.Ct. 598, 607–09, 46 L.Ed.2d 561 (1976); *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Although it seems especially acute here, I need not reach the concern for dual federalism that arises in this case, because the record fails so utterly to show any good-faith pocketbook action.

As the cases involving challenges to federal spending make clear, "a taxpayer alleges injury only by virtue of his liability for taxes." *Valley Forge*, 454 U.S. at 478, 102 S.Ct. at 762. Despite *Valley Forge's* general admonition that the rock-bottom injury "requirements of Art. III are not satisfied merely because a party requests a court of the United States to declare its legal rights, and has couched the request ... in terms that have a familiar ring to those trained in the legal process," 454 U.S. at 471, 102 S.Ct. at 757–58, the majority allows just that kind of request from the non-Hawaiians.

The non-Hawaiians' pleadings set forth particular amounts that Hawaii had appropriated, spent, or intended to spend (Maj. op. at 1180), and they do claim they have "been burdened with the necessity to provide more taxes." Apart from that form of words, however, their allegations offer nothing else. The non-Hawaiian plaintiffs in no way allege *how* operation of the benefits plan under an unreasonable definition of "Hawaiian" "increases any tax they do pay." *Doremus*, 342 U.S. at 433, 72 S.Ct. at 397. They have shown no logical connection between such an increase in their own tax liability and the unreasonable definition the statute purportedly embodies. In addition, the non-Hawaiians have made no colorable allegation that the challenged "activity is supported by any separate tax or ... that it adds any sum whatever," *id.*, to the cost of running the benefit program without the use of the unreasonable definition of "Hawaiian." Without that nexus, they have not shown "possession of the requisite financial interest that is, or is threatened to be, injured by the unconstitutional conduct." *Id.* at 435, 72 S.Ct. at 397–98.

Even if I were to assume that the non-Hawaiians had shown all that, they would also have to show that the increase had more than a " 'comparatively minute[,] remote, fluctuating and uncertain' ... impact on the taxpayer." *United States v. Richardson*, 418 U.S. 166, 172, 94 S.Ct. 2940, 2944, 41 L.Ed.2d 678 (1974), *quoting Massachusetts v. Mellon*, 262 U.S. at 487, 43 S.Ct. at 601. To the extent they merely, without more, list amounts of tax money that Hawaii will spend, and assert they have been burdened with a "necessity" to provide more taxes, the non-Hawaiians failed to show they have more than a minute claim. More importantly, they fail to show they do not merely suffer "in some indefinite way in common with people generally." *Doremus*, 342 U.S. at 434, 72 S.Ct. at 397, *quoting Massachusetts v. Mellon*, 262 U.S. at 488, 43 S.Ct. at 601. Federal courts are not for the airing of "general complaints about the way in which government goes about its business." *Allen*, —— U.S. at ——, 104 S.Ct. at 3330. Therefore, I dissent.