**Tony VELASQUEZ, et al., Plaintiffs,**

**v.**

**John SENKO, et al., Defendants.**

**No. C–84–20723.**

United States District Court,
N.D. California.

March 31, 1986.

Juan Uranga, California Rural Legal Assistance, Migrant Project, Salinas, Cal., David Grabill, California Rural Legal Assistance, Santa Rosa, Cal., for plaintiffs.

Larry J. Gallagher, Asst. U.S. Atty., San Francisco, Cal., Mark C. Walters, Office of Immigration Litigation, U.S. Dept. of Justice, Civil Division, Washington, D.C., for defendants.

## ORDER RE DEFENDANTS' MOTIONS TO DISMISS AND FOR PARTIAL SUMMARY JUDGMENT

AGUILAR, District Judge.

This amended class action complaint ("Complaint") alleges violations of plaintiffs' constitutional and statutory rights resulting from a series of raids conducted by the Immigration and Naturalization Service (INS), Border Patrol, and local police.[1] The named plaintiffs, who are eight Hispanic and non-Hispanic persons arrested during the raids, seek declaratory and injunctive relief, and damages. The defendants are various directors, agents, and commissioners of the INS and Border Patrol. Presently before the Court are defendants' motions to dismiss and for partial summary judgment.

The Complaint describes seven raids, and the attendant detentions and interrogations, undertaken by defendants in Northern California over the past one and one half years. As part of an alleged pattern and practice, the defendants target predominantly Hispanic towns, neighborhoods, and businesses for warrantless dragnet searches and seizures of suspected illegal aliens. Although the precise circumstances of each raid differ, the underlying rights violations alleged by plaintiffs are the same.

Two of the alleged INS raids involved night-time invasions of the small, predominantly Hispanic towns of Parlier and Sanger in Fresno County. On April 6, 1984, armed INS agents and local police equipped with helicopters, bullet-proof vests, and police dogs sealed off a two-block area of Parlier that contained Hispanic business establishments. They entered eight such businesses, positioned themselves at all exits, segregated patrons according to language spoken, interrogated patrons as to their immigration or citizenship status, and forbade anyone from leaving until every patron had been questioned. The interrogations lasted about two hours at each establishment. Suspects were then ordered onto awaiting INS buses.

On September 8, 1984, armed INS agents and local police allegedly employed helicopters, floodlights, and barricades to seal off a section of Sanger that contained Hispanic businesses. The agents entered sixteen such establishments and ordered the arrest of all patrons, including U.S. citizens and lawful permanent residents. Each patron was searched and interrogated, and agents prohibited unauthorized movement, including trips to the bathroom. Some patrons were ordered up against the wall. Others were required to sit on the floor with legs spread so that another person could sit between their legs, and to place their hands on the shoulders of the person in front of

---

1. These raids occurred in public areas, and present questions distinct from those arising from the INS workplace raids challenged in

*Molders International Union v. Nelson,* 643 F.Supp. 884 (N.D.Cal.1986).

them. These interrogations lasted approximately two hours at each establishment.

Three of the alleged actions occurred in Hispanic residential neighborhoods. In Calistoga on the evening of October 4, 1983, INS agents and local police conducted a door-to-door sweep in a predominantly Hispanic neighborhood, ostensibly to serve outstanding traffic warrants. INS agents acted as interpreters. Only one warrant was served, but many Hispanics were detained, questioned, and arrested for immigration violations. On July 10, 1984, INS agents and local police allegedly secured a two-block area of Menlo Park with road blocks and stopped all cars entering or leaving that area. Defendants removed Hispanic males from those automobiles and ordered them into an alley to be interrogated about their citizenship or immigration status. Other agents systematically approached Hispanic households, ordered Hispanic males outside, and then forced them to an alley where an INS agent questioned them. On November 9, 1984, INS agents allegedly conducted a door-to-door sweep in Santa Cruz, demanded entry and forcibly entered private residences, detained and arrested passers-by, and raided a food line operated by the St. Francis Catholic Kitchen.

The two remaining events took place in Hispanic business establishments. It is alleged that on October 4, 1984, INS agents appeared at the Diaz Garage in Watsonville, a meeting place for Hispanic farmworkers, and detained and arrested those farmworkers who were present. On March 11, 1985, in Gilroy, a Border Patrol agent entered the El Charito Market, which serves an Hispanic clientele. The agent approached an Hispanic customer, twisted his arm behind his back, ordered him to produce his immigration papers, and finally

arrested him and another Hispanic customer whom the agent had ordered over.

Plaintiffs' first and second claims allege that defendants detained, arrested, and interrogated class members without warrants or reasonable cause to believe that they were unlawfully present in the United States, in violation of 8 U.S.C. § 1357 and the fourth amendment.

Plaintiffs' third and fourth claims allege intentional discrimination against Hispanics on the basis of race, national origin and language, and against the Non-Hispanic class members on the basis of their association with Hispanics, in violation of 42 U.S.C. § 1981 and the equal protection clause of the fifth amendment.

The fifth claim asserts a violation of plaintiffs' first Amendment right of freedom of association. The sixth claim asserts a 42 U.S.C. § 1985 conspiracy to violate plaintiffs' civil rights. The seventh claim alleges that defendants acted in excess of statutory and regulatory authority as prohibited by the Administrative Procedures Act. The eighth claim alleges inadequate training and supervision. The ninth and last claim is for declaratory relief.

## QUALIFIED IMMUNITY

Plaintiffs sue all but two of the defendants in their individual as well as official capacities.[2] Those defendants named in their individual capacities move for partial summary judgment on the ground that they enjoy qualified immunity from personal liability for damages.[3] Defendants' sole argument in support of their qualified immunity defense is that none of them had any personal involvement with the raids, detentions, interrogations, or arrests alleged in the complaint. Most of the defendants offer sworn declarations to the

---

**2.** Alan Nelson, Commissioner of the INS, and Doris Meisner, Deputy Commissioner of the INS, are sued in their official capacities only.

**3.** The doctrine of qualified immunity does not shield officials from equitable relief. *Hoohuli v. Ariyoshi,* 741 F.2d 1169, 1176 (9th Cir.1984) (qualified immunity defense not justified "when

the relief sought is an injunction halting the implementation of a government program").

Plaintiffs do not dispute that they may not seek damages against the United States or against the defendants in their official capacities. *Gilbert v. DaGrossa,* 756 F.2d 1455, 1458 (9th Cir.1985).

effect that they neither participated in nor had foreknowledge of these events.

The qualified immunity defense serves to reconcile two oft-competing goals: vindication of constitutional guarantees and the vigorous exercise of official discretion. *See Butz v. Economou,* 438 U.S. 478, 504–06, 98 S.Ct. 2894, 2909–11, 57 L.Ed.2d 895 (1978); *Scheuer v. Rhodes,* 416 U.S. 232, 239–42, 94 S.Ct. 1683, 1687–89, 40 L.Ed.2d 90 (1974). The Supreme Court struck a new balance between these two interests in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), by eliminating the subjective element of the qualified immunity test.

The objective standard announced by the *Harlow* Court provides that

> government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Id.* at 818, 102 S.Ct. at 2738–39, 73 L.Ed.2d 396. On summary judgment, the Court instructed, the judge may determine

> not only the currently applicable law, but whether that law was clearly established at the time an action occurred.... Until this threshold immunity question is resolved, discovery should not be allowed. If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordi-

nary circumstances and can prove that he neither knew or should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

*Id.* at 818–19, 102 S.Ct. at 2738–39 (footnote omitted).[4]

In *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Supreme Court interpreted *Harlow* to provide an *"immunity from suit* rather than a mere defense to liability," *id.,* 105 S.Ct. at 2816 (emphasis in original). The Court explained:

> *Unless the plaintiff's allegations state a claim* of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery. See [*Harlow,* 457 U.S.] at 818 [102 S.Ct. at 2738–39]. Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment *if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts.*

*Id.* at 2816 (emphasis added).

■ Read together, the *Harlow* and *Forsyth* cases require a two-step approach to the question of qualified immunity. First, a district court should determine whether the complaint on its face alleges a violation of clearly established law. This is akin to stating a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).[5] If the complaint fails in this

---

**4.** In *Hobson v. Wilson,* 737 F.2d 1 (D.C.Cir. 1984), the court interpreted *Harlow* as follows: Step-by-step, the inquiry proceeds as follows: assume plaintiff alleges that defendant violated Right X, and defendant moves for summary judgment on grounds of qualified immunity, claiming Right X was not established when the alleged acts were committed and, alternatively, that extraordinary circumstances prevented him both from knowing and having reason to know the relevant legal standard. If the district court judge determines as a matter of law that Right X was well-established, a question of fact might still remain as

to whether defendant reasonably neither knew nor should have known of it. The first issue is purely legal and should be susceptible to initial determination on the complaint and summary judgment papers. The latter is potentially an issue for trial, depending upon the unique circumstances of each case. *Id.* at 26.

**5.** The *Forsyth* Court framed the issue on appeal as "a purely legal one: whether the facts alleged ... support a claim of violation of clearly established law." *Id.* at 16 n. 9. The appellate court "need not consider the correctness of the plain-

regard, a defendant is entitled to dismissal on the ground of qualified immunity. If the facts alleged support a claim of a violation of clearly established law, however, the district court must allow sufficient discovery to support a ruling on any defense motion for summary judgment.

■ Although defendants acknowledge that *Harlow* and *Forsyth* govern qualified immunity cases, they decline to apply the requisite analysis here. First, they do not mention, much less attempt to brief, whether the allegations of the complaint describe violations of clearly established law. Second, they propose to stay discovery "until the qualified immunity issue is resolved." Defendants put the cart before the horse.

What defendants urge the Court to do is short-circuit *Harlow* and *Forsyth* by simply adopting defendants' own declarations that purport to exonerate them from liability. They contend, in effect, that any government official who files a declaration denying involvement in a civil rights violation is automatically cloaked in immunity. A court need not inquire whether plaintiff has alleged a violation of clearly established law, nor allow any discovery directed toward that issue.[6]

Defendants' proposition is unsupported by logic or precedent. It would be peculiar at best for a court to make a qualified immunity ruling when the elements of the defense, as defined by *Harlow*, have yet to be asserted. It would be more peculiar still to base such a decision on brief declarations that the plaintiffs have had no opportunity to test through discovery.[7] To shield government agents on such a minimal showing would be tantamount to granting them absolute immunity from damages suits. Moreover, an appellate court would be loathe to review a ruling based on the bare bones of two words—"qualified immunity"—when the defendants did not even suggest below that the complaint failed to allege violations of clearly established law, and no discovery on which to base or review a summary judgment has been had. None of these results is suggested by even the most severe reading of *Harlow* and *Forsyth*.[8]

The weakness of defendants' position is further illustrated by their own use of a conventional procedural tool for eliminating improper parties: Federal Rule of Civil Procedure 12(b). If the Government believes, as it apparently does here, that the raids occurred but that the named defendants are the wrong defendants, then the appropriate remedy is not to raise the qualified immunity defense but to first move to dismiss for failure to state a claim, and

tiff's version of the facts, nor even determine whether the plaintiff's allegations actually state a claim. All it need determine is a question of law...." *Id.* at 16.

**6.** Defendants contend that *Harlow* and *Forsyth* require the Court to stay discovery at this time. Both the *Harlow* and *Forsyth* rulings, and their discussions of discovery restrictions, were directed to the question of damages, not equitable relief. *Harlow*, 457 U.S. at 819 n. 34, 102 S.Ct. at 2739 n. 34; *Forsyth* at 7 n. 5. *See Hoohuli v. Ariyoshi*, 741 F.2d 1169, 1175–76 (9th Cir.1984). As the Fourth Circuit has noted, "[a] present declaration of immunity from damage claims cannot avoid the diversion of [the officials'] attention from other official duties which the litigation [of the equitable claims] will occasion." *Bever v. Gilbertson*, 724 F.2d 1083, 1087 (4th Cir.1984). Thus to the extent plaintiffs seek discovery relating to their claims for equitable relief, defendants' request for a stay of discovery is without merit. To the extent plaintiffs seek discovery pertaining to their damages, de-

fendants must properly assert the qualified immunity defense before the Court can grant a stay. As a practical matter, such a stay would be meaningful only if the damages discovery was significantly different from the discovery directed to the equitable claims.

**7.** Justice would require the Court to allow plaintiffs an opportunity to conduct appropriate discovery. *See* Federal Rule of Civil Procedure 56(f).

**8.** This case does not present the first time that government officials have tried to avoid the qualified immunity analysis prescribed by *Harlow*. In *Hobson v. Wilson*, 737 F.2d 1 (D.C.Cir. 1984), the District of Columbia Court of Appeals rejected as irrelevant to the qualified immunity inquiry the government's assertions that the evidence failed to support plaintiff's allegations. "[S]uch evidence is properly considered as an element of our inquiry into the sufficiency of the evidence, not qualified immunity." *Id.* at 27.

later to move for summary judgment if necessary. Defendants implicitly concede this point, and the Court addresses their 12(b) motion below.

*The Burden of Proof*

Defendants appear to suggest in the alternative that the Court should grant summary judgment on the qualified immunity issue at this early stage because it is the plaintiffs who carry the burden of proving that defendants are *not* protected by qualified immunity.

■ It is settled that qualified immunity is an affirmative defense that must be pleaded by a defendant official. *Harlow*, 457 U.S. at 815, 102 S.Ct. at 2736–37; *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). Although the Supreme Court has yet to decide who carries the burden of proof, the *Harlow* opinion implies that it is the defendant official: "[I]f the official pleading the defense claims extraordinary circumstances and *can prove* that he neither knew nor should have known of the relevant legal standard, the defense should be sustained." *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2738–39 (emphasis added). The Ninth Circuit has now joined its sister circuits [9] in holding that the defendant asserting the qualified immunity defense bears the burden of proof. *Guerra v. Sutton*, 783 F.2d 1371, 1374 (9th Cir.1986).

Because defendants have not met their burden or even addressed the elements of the *Harlow* test for qualified immunity, and discovery has yet to be undertaken, the Court denies the motion for partial summary judgment. The denial is without prejudice to a renewed motion that addresses the pertinent issues.

### RULE 8(a)

■ Defendants move to dismiss the Complaint on the ground that it violates Rule 8(a) of the Federal Rules of Civil Procedure. Rule 8(a) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the Rule is to give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). The liberal notice pleading standard of Rule 8 notwithstanding, Courts generally require that civil rights actions be pleaded with some particularity. *E.g. Ivey v. Board of Regents*, 673 F.2d 266, 268 (9th Cir.1982); *Sherman v. Yakahi*, 549 F.2d 1287, 1290 (9th Cir.1977); *Williams v. Gorton*, 529 F.2d 668, 670–71 (9th Cir.1976). Still, a civil rights plaintiff is not expected to "plead his evidence" or specific factual details not ascertainable in advance of discovery. *Gibson v. United States*, 781 F.2d 1334, 1340 (9th Cir.1986).

■ The defendants cite a host of cases to support their contention that the Complaint violates Rule 8(a).[10] These cases stand for nothing more than that vague, conclusory, and broad-brush allegations of civil rights violations should not withstand a motion to dismiss. The instant Complaint in no way compares to such amorphous pleadings; it describes in considerable detail seven separate operations of the INS and Border Patrol that were allegedly planned or executed by certain of the de-

---

**9.** Since *Harlow* several circuits have expressly or impliedly placed both the burden of pleading and the burden of proof on the defendant official. *See Hobson v. Wilson*, 737 F.2d 1, 26 (D.C.Cir.1984); *Alexander v. Alexander*, 706 F.2d 751, 754 (6th Cir.1983); *Buller v. Buechler*, 706 F.2d 844, 850 (8th Cir.1983). The Fifth and Seventh Circuits before *Harlow* also placed the burden of proof on the party asserting the defense, *Chavis v. Rowe*, 643 F.2d 1281, 1288 (7th Cir.1981); *Murray v. City of Chicago*, 634 F.2d 365, 367 (7th Cir.1980); *Barrett v. Thomas*, 649 F.2d 1193, 1201 (5th Cir.1981), and these decisions stand undisturbed after *Harlow*.

**10.** *E.g., Elliott v. Perez*, 751 F.2d 1472, 1476 (5th Cir.1985); *Hobson v. Wilson*, 737 F.2d 1, 29–30 (D.C.Cir.1984); *Dewey v. University of New Hampshire*, 694 F.2d 1, 3–4 (1st Cir.1982), cert denied, 461 U.S. 944, 103 S.Ct. 2121, 77 L.Ed.2d 1301 (1983); *United States v. City of Philadelphia*, 644 F.2d 187, 204–05 (3d Cir.1980); *Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir.1977); *Weathers v. Ebert*, 505 F.2d 514, 516–17 (4th Cir.1974), *cert. denied* 424 U.S. 975, 96 S.Ct. 1480, 47 L.Ed.2d 745 (1976).

fendants and that allegedly violated specified statutory and constitutional rights. Defendants, who appear to concede in their declarations that the raids occurred, cannot seriously argue that they do not have fair notice of the claims against them. Indeed, they do not move for a more definite statement pursuant to Rule 12(e). Again, whether these defendants are the proper defendants is a Rule 12(b) issue addressed below.

Defendants similarly argue that the "pattern and practice" allegations of the complaint are not only vague, but describe events that are "radically dissimilar": large-scale raids as well as one-on-one encounters, conducted with and without local police, occurring in alleys, homes, business establishments, and entire towns. Defendants contend that the potentially infinite variety of conduct described in the complaint gives no indication of the scope of the requested injunctive relief.

■ The admitted diversity of the alleged raids has no bearing on a Rule 8 analysis when, as here, the challenged acts are clearly pleaded and are linked by the common allegation that the defendants repeatedly and systematically acted without warrants, probable cause, or reasonable suspicion. Whether these events are too varied to justify class treatment or an injunction are not Rule 8 issues.

■ Defendants also contend that the complaint fails to plead facts sufficient to support allegations of inadequate training and supervision. Plaintiffs are not privy to the training and supervision of INS and Border Patrol agents, and before discovery cannot be expected to plead that on a certain day, at a certain time, supervisor X failed to adequately train or supervise agent Y. It is sufficient for purposes of Rule 8 that plaintiffs allege conduct from which a reasonable inference may be drawn that these agents did not receive proper training or supervision. Plaintiffs

have done so here. Whether these particular defendants are properly sued under such a theory is, once again, a distinct question addressed below.

Defendants further object to plaintiffs' equal protection, conspiracy, and class allegations. While such objections might be appropriate for Rule 12(b) or Rule 23 motions, they are not pertinent to a Rule 8(a) analysis. The Complaint complies with Rule 8 and those cases requiring civil rights complaints to be pleaded with factual specificity.

### RULE 12(b)(6)

Plaintiffs' damages claims must rest on the doctrine of *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).[11] Defendants contend that because they did not personally participate in the acts complained of, the only theory available to plaintiffs would be that of *respondeat superior*. Because there is no vicarious liability under *Bivens, see Ashelman v. Pope*, 769 F.2d 1360, 1363 (9th Cir.1985); *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir.1979), plaintiffs' damages claims should be dismissed.

Defendants fail to acknowledge that direct personal participation is not the only basis for liability in civil rights cases:

> Anyone who "causes" any citizen to be subjected to a constitutional deprivation is also liable. The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also *by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.*

*Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir.1978) (emphasis added). Thus, in *Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675, 680–81 (9th Cir.1984), the Ninth Circuit subscribed to the reasoning of *McClelland v. Facteau*, 610 F.2d

---

11. The *Bivens* doctrine is the judicially-crafted counterpart to 42 U.S.C. § 1983, and this Court relies on cases construing § 1983 to determine the propriety of *Bivens* claims against federal officers. *See Laswell v. Brown*, 683 F.2d 261, 268 n. 11 (8th Cir.1982), citing *Butz v. Economou*, 438 U.S. 478, 496–505, 98 S.Ct. 2894, 2905–10, 57 L.Ed.2d 895 (1978).

693, 696 (10th Cir.1979) (§ 1983 claim stated when supervisor's alleged failure to train or supervise personnel led to deprivation of rights), and *Wanger v. Bonner,* 621 F.2d 675, 679–81 (5th Cir.1980) (§ 1983 claim stated when alleged policy led to deprivation of rights).

■ Although the Complaint is not a model of clarity in this regard, one can discern two distinct sets of allegations. The Complaint alleges that District Director David Ilchert, Chief Patrol Agent Carl Riedinger, and Patrol Agents-in-Charge John Poole and Bruce Haakedahl were responsible for the policies and practices of their respective offices, which offices participated in the raids. It is further alleged that each man supervised, administered, and controlled the personnel who "participated in the planning and execution of the pattern and practice complained of herein." Viewing the Complaint in its entirety and giving it a liberal reading, as the Court must do on this motion, the facts alleged support the claim that these four defendants either established the policies that led to the alleged rights violations, set in motion the activities of their agents who predictably perpetrated the violations, or failed to properly train or supervise these agents. The allegations are sufficient to withstand a motion to dismiss under *Ybarra* and *Duffy.*

■ In contrast, the complaint simply states that Regional Commissioner Harold Ezell and Directors John Senko and Don Riding are responsible for all INS employees in the region or suboffices, and for the planning and execution of agency policy. It is not alleged that these three defendants created or implemented the particular policies challenged here, or controlled in any direct sense those who "participated in the planning and execution of the pattern and practice." The Court might infer from their rank alone that these three defendants could be liable under *Ybarra* and *Duffy,* but such logic would inexorably lead to each successive supervisor up the chain of command and beyond all possibility of causation. To avoid such a *de facto* application of the doctrine of *respondeat superior,* and in light of the allegations of the Complaint, this Court draws the line at defendants Ezell, Senko, and Riding, and dismisses them in their individual capacities.[12]

Defendants also move to dismiss the 100 Doe defendants joined by plaintiffs. The Ninth Circuit disfavors use of the John Doe device. *See Gillespie v. Civiletti,* 629 F.2d 637, 642 (9th Cir.1980); *Wiltsie v. California Dept. of Corrections,* 406 F.2d 515, 518 (9th Cir.1968). Nevertheless, plaintiffs in civil rights actions should be afforded an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover their identities. *Gillespie, supra,* 629 F.2d at 642. Under the circumstances alleged here, plaintiffs cannot be expected to identify all the proper defendants absent some discovery, and discovery is likely to uncover the names of the agents responsible for the alleged conduct. The motion to dismiss the Doe defendants is denied without prejudice pending execution of a reasonable discovery plan.

Good cause appearing therefor, defendants' motion for partial summary judgment on the ground of qualified immunity is DENIED. The motion to dismiss is DENIED except as to the claims against Ezell, Senko, and Riding in their individual capacities.

IT IS SO ORDERED.

12. The Court bases its ruling solely on the allegations of the complaint, and does not now consider the defendants' declarations denying personal involvement in or foreknowledge of the raids.