Earl F. ARAKAKI, Evelyn C. Arakaki, Edward U. Bugarin, Sandra Puanani Burgess, Patricia A. Carroll, Robert M. Chapman, Brian L. Clarke, Michael Y. Garcia, Roger Grantham, Toby M. Kravet, James I. Kuroiwa, Jr., Frances M. Nichols, Donna Malia Scaff, Jack H. Scaff, Allen H. Teshima, Thurston Twigg–Smith, Plaintiffs,

v.

Benjamin J. CAYETANO in his official capacity as Governor of the State of Hawaii, Neal Miyahira, in his official capacity as director of the Dept. of Budget and Finance, Glenn Okimoto, in his official capacity as State Comptroller and Director of Dept. of Accounting and General Services, Gilbert Coloma–Agaran, in his official capacity as Chariman of Board of Land and Natural Resources, James J. Nakatani, on his official capacity as Direcotr of Dept. of Agriculture, Seiji

F. Naya, in his official capacity as director of Dept. of Business, Economic Development and Tourism, Brian Minaai, in his official capacity as Director of Dept. of Transportation, Defendants.

Haunani Apoliona, chairman, and Rowena Akana, Donald B. Cataluna, Linda Dela Cruz, Clayton Hee, Colette Y.P. Machado, Charles Ota, Oswald Stender, and John D. Waiheʻe, IV in their official capacities as trustees of the Office of Hawaiian Affairs, State Defendants.

Raynard C. Soon, Chairman, and Wonda Mae Agpalsa, Henry Cho, Thomas P. Contrades, Rockne C. Freitas, Herring K. Kalua, Milton, PA, and John A.H. Tomoso, in their official capacities as members of the Hawaiian Homes Commission, OHA Defendants.

The United States of America, and John Does 1 through 10, HHCA/ DHHL Defendants.

CIVIL NO. 02–00139 SOM/KSC.

United States District Court, D. Hawaiʻi.

March 18, 2002.

H. William Burgess, Patrick W. Hanifin, Im Hanifin Parsons, LLLC, Honolulu, HI, for plaintiffs.

Charlene M. Aina, Gerard D. Lau, Atty. Gen., Honolulu, HI, for Benjamin J. Cayetano, State Officials, Hawaiian Homes Commissioners.

Thomas A. Helper, U.S. Attorney's Office, Honolulu, HI, for U.S.

Sherry P. Broder, Davies Pacific Center, Honolulu, HI, for Trustees of Office of Hawaiian Affairs.

Robert G. Klein, McCorriston Miller Mukai MacKinnon, Honolulu, HI, for SCHHA.

*ORDER GRANTING PROPOSED DEFENDANT–INTERVENORS*
 *STATE COUNCIL OF HAWAIIAN HOMESTEAD ASSOCIATION AND ANTHONY SANG, SR.'S, MOTION TO INTERVENE; ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER*

MOLLWAY, District Judge.

## I. *INTRODUCTION.*

Plaintiffs identify themselves as individual taxpayers in Hawaii. Plaintiffs seek to stop the State of Hawaii (the "State" or "Hawaii"), the Hawaiian Homes Commission ("HHC"), the Department of Hawaiian Home Lands ("DHHL"), and the Office of Hawaiian Affairs ("OHA") from continuing what Plaintiffs characterize as race-based actions. Specifically, Plaintiffs, some of whom are of Hawaiian ancestry, seek to stop the provision of exclusive benefits to persons of Hawaiian or native Hawaiian ancestry.[1] On the present Motion for Temporary Restraining Order (the "Motion"), Plaintiffs ask the court:

A. To restrain HHC and DHHL from issuing any further homestead leases and from expending or encumbering any further funds from the Hawaiian Home Lands trust fund;

B. To restrain the State from depositing any further funds into the Hawaiian Home Lands trust fund;

C. To restrain OHA from expending or encumbering any part of the accounts or assets presently held in the "Total Fund Equity" referred to in the OHA Financial Report (11/30/2001) as totaling $337,985,289;

D. To restrain the State, HHL, DHHL, and OHA from issuing any further bonds or otherwise borrowing any further money for HHC, DHHL, or OHA;

E. To restrain the State from making any further payments to or for HHC, DHHL, or OHA; and

F. To restrain OHA, HHC, and DHHL from expending any further public funds for lobbying, advertising, or other advocacy of the allegedly racially discriminatory goals of OHA and DHHL.

The court's analysis of the Motion is divided into two parts. The court begins by looking at whether Plaintiffs have standing to bring the claims they assert. Standing is a constitutional requirement, and it is Plaintiffs' burden to show that they meet this requirement. With respect to most of the relief they request, Plaintiffs, on the present record, fail to satisfy their burden. The only claims that Plaintiffs establish standing to assert are claims that the State is disbursing tax revenue based on race, in violation of the Fourteenth Amendment. Because the court finds standing on at least one claim, the court turns to the second part of its analysis, an inquiry into whether Plaintiffs show that they are entitled to a restraining order. The answer, at least on the present record in this expedited proceeding, is "no." Plaintiffs fail to show that they are in danger of suffering any irreparable injury during the time that any temporary

---

1. The State Council of Hawaiian Homestead Association and Anthony Sang, Sr. (collectively "HHA Intervenors"), have moved to intervene in this action. For the reasons set forth at the hearing, HHA Intervenors' motion is granted.

restraining order would be in effect. Because the present record contains no evidence that there is anything that this court needs to restrain during the period that could be covered by a temporary restraining order, the court denies the Motion.[2]

## II. FACTUAL BACKGROUND.

The parties' differing positions are rooted in the history of Hawaii. This history has been summarized by the Supreme Court in Rice v. Cayetano, 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000). Although scholars debate various aspects of this history, this court need not, on the present motion, resolve those debates. The court instead sets forth here a brief factual background only to put this case into context.

In the late eighteenth century, there were four different native Hawaiian kings, one ruling each of Hawaii's major islands. The Hawaiians had their own cultural and political structure. The islands were not visited by any European until 1778, when Captain James Cook, flying a British flag, made landfall. Later, in 1810, the islands were unified as one kingdom under King Kamehameha I. Id. at 500–01, 120 S.Ct. 1044.

Under Kamehameha I, lands were controlled by a feudal system. Id. at 502, 120 S.Ct. 1044. In 1839, a successor to Kamehameha I, Kamehameha III, issued the first of a series of decrees and laws designed to accommodate demands for ownership of land and security of title. Although Kamehameha III conferred freehold title to land on certain chiefs and other individuals, he retained vast lands for himself and directed that other extensive lands be held by the government. Id.

On January 17, 1893, the United States overthrew the Kingdom of Hawaii. A century later, Congress acknowledged that this overthrow was illegal, and that it deprived native Hawaiians of their right to self-determination. See P.L. 103–50 (November 23, 1993), reprinted in 107 Stat. 1510 ("Apology Resolution"). In 1894, a provisional government established the Republic of Hawaii. Rice, 528 U.S. at 505, 120 S.Ct. 1044.

In 1898, the "Newlands Resolution" annexed the Hawaiian Islands as a territory of the United States. Rice, 528 U.S. at 505, 120 S.Ct. 1044. By this resolution, the Republic of Hawaii ceded all crown, government, and public lands to the United States. 30 Stat. 750. In accepting the cession of these lands, Congress stated:

> The existing laws of the United States relative to public lands shall not apply to such lands in the Hawaiian Islands; but the Congress of the United States shall

---

**2.** As set forth at the hearing on this motion, the court bifurcates the motion, setting Plaintiffs' motion for preliminary injunction for hearing on July 24, 2002, at 9:00 a.m.

Because of the extremely expedited briefing, the court intends to allow the parties to raise all standing issues for more orderly consideration at a hearing on April 29, 2002. Toward that end, the court extends the time for filing any motion to reconsider the standing decisions in the present order. Any motion challenging any standing ruling in the present order may be filed on or before April 2, 2002, and shall be heard on twenty-seven days' notice, rather than on the usual twenty-eight days' notice. As the court announced at

the hearing on the present Motion, the court intends to address all motions regarding standing at a hearing on April 29, 2002. Motions for reconsideration of nonstanding decisions included in the present order are due by the deadline set forth in the Local Rules. The hearing on April 29 is reserved for standing issues.

Motions to dismiss based on grounds other than standing must be filed by the deadlines set forth in court rules. By the present order, the court modifies the usual requirements for Rule 12 motions and requires that motions to dismiss based on nonstanding grounds be filed separately from motions to dismiss based on standing grounds.

enact special laws for their management and disposition: *Provided,* That all revenue from or proceeds of the same, except as regards such part thereof as may be used or occupied for the civil, military, or naval purposes of the United States, or may be assigned for the use of the local government, shall be used solely for the benefit of the inhabitants of the Hawaiian Islands for educational and other public purposes.

30 Stat. 750.

In 1921, Congress enacted the Hawaiian Homes Commission Act ("HHCA"), 42 Stat. 108, setting aside about 200,000 acres of lands ceded to the United States by the Republic of Hawaii and creating a program of loans and long-term leases for the benefit of "native Hawaiians."[3] *Rice,* 528 U.S. at 507, 120 S.Ct. 1044. The purpose of the HHCA was to "rehabilitate the native Hawaiian population." *Rice,* 528 U.S. at 507, 120 S.Ct. 1044; *see also* H.R.Rep. No. 839 at 2 (1920) (titled "Rehabilitation of Native Hawaiians") (characterizing native Hawaiians as a "Dying Race," noting that the number of full-blooded Hawaiians had dropped from 142,650 in 1826 to about 22,600 in 1919 (with an addition 16,660 people being "part Hawaiian"), and stating that the death rate was "greatly in excess of that of any other race inhabiting the islands"). The Supreme Court attributed the decline in the native Hawaiian population to the introduction of western diseases and infectious agents. *Rice,* 528 U.S. at 506, 120 S.Ct. 1044.

Additionally, a congressional Report regarding the HHCA indicated that, since the institution of private ownership of lands in Hawaii, the native Hawaiians (out-side the king and the chiefs) "were granted and have held but a very small portion of the lands of the Islands." H.R.Rep. No. 839 at 6 (1920). The report noted that the "Hawaiians are not business men and have shown themselves unable to meet competitive conditions unaided." *Id.*

In 1959, when Hawaii became the fiftieth state in the union, Hawaii agreed to adopt the HHCA as part of Hawaii's constitution. Haw. Const. art. XII, §§ 2–3. The United States granted Hawaii title to all public lands and public property within the state, except for lands that the federal government retained for its own use. P.L. 86–3 (March 18, 1959), *reprinted in* 73 Stat. 4, 5 ("Admission Act"). The 200,000 or so acres set aside by the HHCA for the benefit of native Hawaiians was granted to Hawaii.[4] *Rice,* 528 U.S. at 507, 120 S.Ct. 1044. These public lands, as well as the proceeds and income therefrom, are now held by Hawaii "as a public trust." Haw. Const. art. XII, § 4; *Rice,* 528 U.S. at 507–08, 120 S.Ct. 1044. This "public trust" is to be used for one or more of the following:

[1] for the support of the public schools and other public educational institutions, [2] for the betterment of the conditions of native Hawaiians, as defined in the Hawaiian Homes Commission Act, 1920, as amended, [3] for the development of farm and home ownership on as widespread a basis as possible[,][4] for the making of public improvements, and [5] for the provision of lands for public use.

73 Stat. at 6; *see also Price v. Akaka,* 3 F.3d 1220, 1222 (9th Cir.1993) (*"Price V"*), *cert. denied,* 511 U.S. 1070, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994).[5] It appears that,

---

**3.** As used in the HHCA, "native Hawaiians" was defined to include "any descendant of not less than one-half part of the blood of the races inhabiting the Hawaiian Islands previous to 1778." 42 Stat. 108; *Rice,* 528 U.S. at 507, 120 S.Ct. 1044.

**4.** HHC now manages these 200,000 or so acres. *See* Haw.Rev.Stat. § 10–3(3).

**5.** The Ninth Circuit had ruled in several earlier matters involving Price. *See Price v. Hawaii,* 764 F.2d 623 (9th Cir.1985) (*"Price I"*),

until the late 1970s, the income from the "public trust" largely flowed to Hawaii's Department of Education. *See* Hawaii House Journal, S. Com. Rep. No. 672, at 1477 (1979); Hawaii Senate Journal, S. Com. Rep. No. 784, at 1351 (1979); Hawaii Senate Journal, Conf. Com. Rep. No. 77, at 998 (1979).

In 1978, OHA was established by a state constitutional amendment. *See* Haw. Const. art. XII, §§ 5–6. The purposes of OHA include 1) bettering the condition of Hawaiians and native Hawaiians,[6] 2) serving as the principal state agency responsible for the performance, development, and coordination of programs and activities relating to Hawaiians and native Hawaiians; 3) assessing the policies and practices of other agencies affecting Hawaiians and native Hawaiians; 4) applying for, receiving, and disbursing grants and donations from all sources for Hawaiian and native Hawaiian programs and services; and 5) serving as a receptacle for reparations. Haw.Rev. Stat. § 10–3. OHA was charged with the responsibility of administering and managing some of the public trust proceeds. *See Price V,* 3 F.3d at 1222.

The constitutional convention committee members who drafted the proposed amendment establishing OHA stated:

> Members were impressed by the concept of the Office of Hawaiian Affairs which establishes a public trust entity for the benefit of the people of Hawaiian

ancestry. Members foresaw that it will provide Hawaiians the right to determine the priorities which will effectuate the betterment of their condition and welfare and promote the protection and preservation of the Hawaiian race, and that it will unite Hawaiians as a people.

> The present Hawaiian population is a young one. Approximately 50 percent of the total Hawaiian population is under the age of 70. The Hawaiian people today should be given the opportunity to provide for the betterment of the condition and well-being of these young Hawaiians and to address the contemporary problems that Hawaiians face—crime, inadequate housing conditions, welfare rolls and education. This proposal gives Hawaiians, a great and proud people, the opportunity and the means to do so. Your Committee feels that it is time the Hawaiians have more impact on their future.

1 Proceedings of the Constitutional Convention of Hawaii of 1978, Committee of the Whole Rep. No. 13 at 1018 (1980).

In enacting laws regarding OHA, Hawaii's legislature noted that the laws might be viewed "as standing in contradiction to Hawaii's commitment to equality because it is addressed to the needs of a specific people, the Hawaiians." Hawaii Senate Journal, S. Com. Rep. No. 784, at 1351 (1979). However, Hawaii's legislature

---

cert. denied, 474 U.S. 1055, 106 S.Ct. 793, 88 L.Ed.2d 771 (1986); *Price v. Hawaii,* 921 F.2d 950 (9th Cir.1990) (*"Price II "*); *Price v. Akaka,* 928 F.2d 824 (9th Cir.1990) (*"Price III "*), cert. denied, 502 U.S. 967, 112 S.Ct. 436, 116 L.Ed.2d 455 (1991); *Price v. Hawaii,* 939 F.2d 702 (9th Cir.1991) (*"Price IV "*), cert. denied, 503 U.S. 938, 112 S.Ct. 1479, 1480, 117 L.Ed.2d 622 (1992).

**6.** As used in the chapter governing OHA, "Hawaiian" means "any descendent of the aboriginal peoples inhabiting the Hawaiian Islands which exercised sovereignty and sub-

sisted in the Hawaiian Islands in 1778, and which peoples thereafter have continued to reside in Hawaii." Haw.Rev.Stat. § 10–2. "Native Hawaiian," on the other hand, means "any descendant of not less than one-half part of the races inhabiting the Hawaiian Islands previous to 1778, as defined by the Hawaiian Homes Commission Act, 1920, as amended; provided that the term identically refers to the descendants of such blood quantum of such aboriginal peoples which exercised sovereignty and subsisted in the Hawaiian Islands in 1778 and which peoples thereafter continued to reside in Hawaii." *Id.*

stated that it was not its intent to be so "divisive." *Id.* Instead, the legislature stated that it intended "that the Office of Hawaiian Affairs should bring to eventual reality the equal participation of Hawaiians in the ultimate homogeneous and perfectly equal society that we seek to achieve for all posterity." *Id.*

Under Haw.Rev.Stat. §§ 10–13.5 and 10–3, OHA is funded, in part, by 20 percent of all income derived from the public land trust. *Price V*, 3 F.3d at 1222. With respect to money transferred to OHA pursuant to Hawaii's obligations under the public land trust, the Ninth Circuit has noted that the five enumerated purposes set forth above still govern OHA's use or disposal of the funds. *Id.*

## III. *TEMPORARY RESTRAINING ORDER STANDARD.*

■ The standard for granting a temporary restraining order ("TRO") is identical to that for a preliminary injunction. *Hawai'i County Green Party v. Clinton*, 980 F.Supp. 1160, 1164 (D.Haw.1997). Accordingly, to obtain a TRO, a party must demonstrate either: 1) probable success on the merits and irreparable injury; or 2) sufficiently serious questions going to the merits to make the case a fair ground for litigation, with the balance of hardships tipping decidedly in favor of the party requesting relief.[7] *Topanga Press, Inc. v. City of Los Angeles*, 989 F.2d 1524, 1528 (9th Cir.1993), *cert. denied*, 511 U.S. 1030, 114 S.Ct. 1537, 128 L.Ed.2d 190 (1994). These two formulations represent two points on a sliding scale, with the required degree of irreparable harm increasing as the probability of success decreases. *Miller v. California Pac. Med. Ctr.*, 19 F.3d

449, 456 (9th Cir.1994). These formulations are not separate tests, but the extremes of a single continuum. *Los Angeles Mem'l Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1201 (9th Cir.1980). "If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Alaska v. Native Vill. of Venetie*, 856 F.2d 1384, 1389 (9th Cir.1988) (*quoting Aguirre v. Chula Vista Sanitary Serv.*, 542 F.2d 779 (9th Cir.1976)). If the plaintiff shows no chance of success on the merits, the injunction should not issue. Moreover, under any formulation, the moving party must demonstrate a "significant threat of irreparable injury." *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir.1987). Finally, a plaintiff must do more than merely allege imminent harm sufficient to establish standing; he or she must demonstrate immediate threatened injury as a prerequisite to preliminary injunctive relief. *Associated Gen. Contractors of Cal., Inc. v. Coalition For Econ. Equity*, 950 F.2d 1401, 1410 (1991), *cert. denied*, 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992).

## IV. *PLAINTIFFS ARE NOT ENTITLED TO A TRO.*

Plaintiffs have standing to assert only some of the claims on which they seek relief. With respect to the narrow claims for which Plaintiffs have standing, Plaintiffs fail to demonstrate any possibility that they will be harmed during the time period for which this court may issue a

---

**7.** Traditionally, there were four factors to be considered in deciding whether an injunction or restraining order should issue: 1) the likelihood of the plaintiff's success on the merits; 2) the threat of irreparable harm to the plaintiff if the injunction is not imposed; 3) the relative balance of the harm to the plaintiff and the harm to the defendant; and 4) the public interest. *Alaska v. Native Vill. of Venetie*, 856 F.2d 1384, 1388 (9th Cir.1988). These factors have been collapsed into the current test. *See id.*

temporary restraining order. Accordingly, the court denies Plaintiffs' motion.

### A. Equal Protection Claims.

Plaintiffs claim that the provision of benefits exclusively to Hawaiians and/or native Hawaiians by OHA, HHC, and DHHL violates the Equal Protection Clause of the Fourteenth Amendment.

### 1. Plaintiffs Have Standing to Assert Some of Their Equal Protection Claims.

■ Plaintiffs have standing to assert only some of their equal protection claims. The court's review of the standing issue begins with Article III, section 2, of the Constitution, which confines federal courts to deciding cases or controversies. To qualify for adjudication by a federal court, a plaintiff must show that an actual controversy exists at all stages of the case. *Arizonans for Official English v. Arizona*, 520 U.S. 43, 63, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). No case or controversy exists if a plaintiff lacks standing to make the claims asserted. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir.2000) (stating that standing pertains to a federal court's subject matter jurisdiction).

■ To have standing to maintain a claim, a plaintiff must demonstrate: 1) an injury in fact—an invasion of a legally protected interest that is concrete and particularized, as well as actual or imminent, not conjectural or hypothetical; 2) a causal relationship between the injury and the challenged conduct—an injury that is fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and 3) a likelihood, not mere speculation, that the injury will be redressed by a favorable decision. *Lujan*

*v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir.1996). Plaintiffs argue that they have been injured as State of Hawaii taxpayers and that they therefore have taxpayer standing for their federal equal protection claims.[8]

■ A state taxpayer has standing to challenge a state statute when that taxpayer is able to show that he or she " 'has sustained or is immediately in danger of sustaining some direct injury as the result of [the challenged statute's] enforcement.' " *Cammack v. Waihee*, 932 F.2d 765, 769 (9th Cir.1991) (quoting *Doremus v. Board of Educ.*, 342 U.S. 429, 434, 72 S.Ct. 394, 96 L.Ed. 475 (1952)), *cert. denied*, 505 U.S. 1219, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992). A taxpayer establishes the requisite direct injury when he or she brings a "good-faith pocket book action" demonstrating that the challenged statute involves the expenditure of state tax revenues. *See Cammack*, 932 F.2d at 769. To have standing, the taxpayer must allege a direct injury caused by the expenditure of tax dollars. In other words, the pleadings of a valid taxpayer suit must set forth the relationship between the taxpayer, tax dollars, and the allegedly illegal government activity. *Cantrell v. City of Long Beach*, 241 F.3d 674, 683 (9th Cir. 2001).

The Ninth Circuit found that the plaintiffs in another case had taxpayer standing to bring a claim similar to claims at issue here. In *Hoohuli v. Ariyoshi*, 741 F.2d 1169 (9th Cir.1984), the plaintiffs claimed taxpayer standing to attack OHA. The plaintiffs complained that their tax dollars were being spent on a program that disbursed benefits based on impermissible ra-

---

8. Plaintiffs do not argue that they have actually suffered discrimination. No Plaintiff, for example, claims to have applied for benefits and have been turned down solely because he or she was not native Hawaiian.

cial classifications. *Id.* at 1172. The plaintiffs asked the district court to enjoin the spending of tax monies from the state General Fund for the benefit of the alleged racial class of "Hawaiians." *Id.* For the most part, the Ninth Circuit found that this was sufficient to give the plaintiffs in *Hoohuli* taxpayer standing. *Id.* at 1180–81. The Ninth Circuit therefore found that the plaintiffs had standing to challenge the appropriating, transferring, and spending of taxpayers' money from the General Fund of the state treasury.[9] *Id.*

█ In the present case, the Complaint alleges that Plaintiffs pay Hawaii taxes. Complaint ¶ 9. The Complaint further alleges that tax revenue of $7,154,969 was appropriated to DHHL for Fiscal Year 2001. Complaint § 58(d). Although the Complaint does not state any particular amount, it alleges that tax revenues are appropriated to OHA. Complaint ¶ 62(b). Defendants do not appear to be disputing that at least some tax revenues do go to DHHL and OHA. Plaintiffs allege that these funds are being spent in violation of the Equal Protection Clause. Complaint ¶¶ 34, 58(d), 62(b). These allegations sufficiently set forth the relationship between the taxpayer, tax dollars, and the allegedly illegal government activity such that Plain-

tiffs demonstrate taxpayer standing for their claim. *See Cantrell,* 241 F.3d at 683; *Hoohuli,* 741 F.2d at 1180–81. Accordingly, Plaintiffs have standing to seek to restrain the State's expenditures of tax revenues on HHC, DHHL, and/or OHA.

Plaintiffs bring other equal protection claims as taxpayer challenges, but Plaintiffs fail to establish standing to bring those claims. Plaintiffs may be able to establish standing as the record develops, on taxpayer or other grounds. However, on the present record, they do not do so and are therefore not entitled to an order temporarily restraining those alleged equal protection violations.

█ For example, Plaintiffs seek to enjoin the State from depositing any funds into the Hawaiian Home Lands trust fund. Such deposits may involve the expenditure of taxpayer money, but that is not clear at this time. Those deposits may represent funds paid in settlement of litigation. *See* Ex. Q (referring to legislation that resolves land claims involving compensation for the past use of and title to Hawaiian Home Lands). At the hearing on this Motion, the State indicated that these deposits may include amounts promised in settlement of a lawsuit filed in the state circuit court. If the challenged deposits include litigation

---

9. District courts in California have interpreted *Hoohuli* as imposing a standing requirement that a taxpayer claimant challenge the spending of money only from a state's General Fund. *See Green v. Graduate Theological Union,* 2000 WL 1639514, *5 (N.D.Cal.2000) ("The Ninth Circuit's 'general fund' requirement for state taxpayer standing serves the same purpose—to assure that state taxpayers assert bona fide pocketbook injuries instead of impermissible generalized grievances. Without this general fund requirement, state residents could assert taxpayer status to challenge any expenditure of a state office, board, or commission. In the university context, for example, state residents could challenge the university library's purchase of certain books, or the university's programming of controver-

sial speakers"); *Van Dyke v. Regents of Univ. of Cal.,* 815 F.Supp. 1341, 1345 (C.D.Cal. 1993) ("The general fund requirement for state taxpayer standing in this Circuit serves the same purpose: to ensure that state taxpayers assert bona fide pocketbook injuries instead of impermissible generalized grievances"). Although the court recognizes the persuasive logic of these decisions, the court is not convinced at this time that Ninth Circuit precedent does indeed impose a taxpayer standing requirement that the challenge be to a General Fund expenditure. *See Cammack,* 932 F.2d at 769 (a taxpayer establishes the requisite direct injury when he or she brings a "good-faith pocket book action" demonstrating that the challenged statute involves the expenditure of state tax revenues).

settlement payments, then Plaintiffs may not collaterally attack that settlement in this court. Any challenge to a settlement should have been raised in the underlying litigation, with Plaintiffs at least attempting to intervene in that underlying suit. *See generally Marino v. Ortiz*, 484 U.S. 301, 303–04, 108 S.Ct. 586, 98 L.Ed.2d 629 (1988) (a divided Court affirmed the dismissal of a suit to challenge a consent decree brought by nonparties to the underlying litigation).

■ Plaintiffs also seek to enjoin the State from issuing any further bonds or otherwise borrowing money from HHC, DHHL, or OHA. Because the record does not show that the issuance of bonds by the State or the State's borrowing of money from HHC, DHHL, or OHA involves the expenditure of taxpayer money, the court cannot find on the present record that Plaintiffs have taxpayer standing to challenge the bond or loan programs.

■ Nor do Plaintiffs establish taxpayer standing to seek an injunction of 1) the issuing by HHC/DHHL of further homestead leases and the spending or encumbering of further funds from the Hawaiian Home Lands trust fund; 2) the spending or encumbering by OHA of any part of the accounts or assets presently held in the "Total Fund Equity" referred to in the OHA Financial Report (11/30/2001) as totaling $337,985,289; 3) the issuing by HHL/DHHL and OHA of any further bonds; or 4) the spending by HHL/DHHL and OHA of any further public funds for lobbying, advertising, or other advocacy of alleged racially discriminatory goals. Once again, Plaintiffs do not, on the present record, meet their burden of showing that the above actions involve the use of tax revenues. The record indicates that DHHL and OHA, for example, receive assets or income in the form of returns on investments or rent receipts. Such money does not come directly from tax receipts.

Taxpayer standing rests on the proposition that money paid by taxpayers may not be wrongfully used. If taxpayers are not the source of the funds in issue (for example, if money is instead raised through bonds or rent), then expenditures and actions may not be challenged based on taxpayer status. *See Cantrell*, 241 F.3d at 683; *Hoohuli*, 741 F.2d at 1180–81. There may, of course, be bases other than taxpayer status through which allegedly wrongful expenditures or actions may be challenged. A person who is a direct victim of racial discrimination has such a different basis. Plaintiffs, however, have chosen to assert taxpayer standing, and Plaintiffs do not show that the narrow taxpayer basis encompasses all the challenges they bring.

2. *Plaintiffs Are Not Entitled to a Temporary Restraining Order Concerning Equal Protection Claims They Do Have Standing to Bring.*

■ Although the court does conclude that Plaintiffs have standing to challenge at least the expenditure of taxpayer money on OHA, HHC, and DHHL, Plaintiffs have failed on this motion to show that they are entitled to an order restraining such an expenditure.

The starkest failing in Plaintiffs' Motion is its failure to establish irreparable harm in the absence of a restraining order. Plaintiffs have stated that their motion does not seek to restrain the payment of administrative costs such as rent and salaries. The court asked Plaintiffs at the hearing on their Motion whether, in the absence of a restraining order, there would be an expenditure of taxpayer money for matters other than administrative costs during the time that a temporary restraining order could be in effect. The court noted that a temporary restraining order would be limited to ten days, unless ex-

tended. Any extension could not exceed another ten days, except by agreement of the restrained parties. *See* Fed.R.Civ.P. 65(b). Thus, the court inquired whether there would be an expenditure of taxpayer funds within the next twenty days for purposes beyond normal operating costs for OHA, HHC, and DHHL. Plaintiffs knew of no such expenditures. On this Motion, it is Plaintiffs' burden to demonstrate the imminent irreparable injury that their motion seeks to avoid. As Plaintiffs fail to meet their burden, they are not entitled to a temporary restraining order.

Even if Plaintiffs had shown that taxpayer money would be appropriated or otherwise spent in the next ten to twenty days on OHA, HHC, and/or DHHL, Plaintiffs would not be entitled to a restraining order. Such an order requires a showing of (1) a likelihood of success on the merits or (2) serious questions as to the merits, with the balance of hardships tipping decidedly in the moving party's favor. *See Topanga*, 989 F.2d at 1528. Plaintiffs do not make either showing.

Plaintiffs argue that the use of taxpayer revenue to benefit only native Hawaiians is an impermissible type of race discrimination. Plaintiffs rest their argument primarily on *Rice*. In *Rice*, 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007, the Supreme Court faced a challenge to OHA's requirement that people voting in the election of OHA's trustees must be of Hawaiian ancestry. The statute at issue defined qualified voters as persons who could trace their ancestry back to the inhabitants of Hawaii prior to 1778. *Id.* at 516–17, 120 S.Ct. 1044. Although the Court noted that, before 1778, people had migrated to Hawaii from various places, the Court recognized that "[a]ncestry can be a proxy for race." *Id.* at 514, 120 S.Ct. 1044. It concluded that Hawaii's electoral restriction was a "race-based voting qualification." *Id.* at 517, 120 S.Ct. 1044. Although OHA

had a "unique position under state law," the Court determined that it remained "an arm of the State." *Id.* at 521, 120 S.Ct. 1044. Because the elections for OHA trustees were elections sponsored by the State, the Fifteenth Amendment, which prohibits the federal government and the states from denying or abridging the right to vote on account of race, *see id.* at 512, 120 S.Ct. 1044, prohibited Hawaii's electoral qualification based on Hawaiian ancestry. *Id.* at 522–23, 120 S.Ct. 1044.

Plaintiffs argue that the benefits from OHA and HHC/DHHL are similarly available only to those of Hawaiian ancestry. Pursuant to *Rice*, Plaintiffs contend that the restriction of benefits to those of Hawaiian ancestry violates the Equal Protection Clause of the Fourteenth Amendment.

■■■ The Equal Protection Clause provides that no state shall deny to any person within its jurisdiction the equal protection of the laws. Its central purpose is to prevent the states from purposefully discriminating among individuals on the basis of race. *Shaw v. Reno*, 509 U.S. 630, 642, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). Governmental action can run afoul of the Equal Protection Clause when the government explicitly classifies or distinguishes among persons by reference to impermissible criteria such as race, sex, religion, or ancestry. *De La Cruz v. Tormey*, 582 F.2d 45, 49 (9th Cir.1978), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979). Accordingly, Plaintiffs argue that the ancestry requirements at issue here can only be upheld if they pass strict scrutiny. That is, they must be "narrowly tailored to further a compelling governmental interest." *See Shaw*, 509 U.S. at 643, 113 S.Ct. 2816. Plaintiffs argue that the present restrictions are "presumptively invalid and can be upheld only upon an extraordinary justification." *Shaw*, 509 U.S. at 643–44, 113 S.Ct. 2816. Plaintiffs, however, have not demonstrated on the

present motion that "strict scrutiny" is the appropriate standard.

More than a decade ago, now-Chief Judge David Ezra analogized native Hawaiians to American Indian tribes. Accordingly, Chief Judge Ezra did not apply "strict scrutiny" to classifications involving native Hawaiians. Instead, he applied the body of law permitting preferences to be given to American Indian tribes, *see, e.g., Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), to find that the HHCA "does not create a suspect classification which offends the constitution." [10] *Naliielua v. Hawaii,* 795 F.Supp. 1009, 1012–13 (D.Haw.1990), *aff'd,* 940 F.2d 1535 (1991).

■ It is not clear whether *Rice* affects the viability of *Naliielua.* In *Rice,* the Court avoided deciding whether native Hawaiians are "tribes" for purposes of the *Morton* analysis. *Rice,* 528 U.S. at 519, 120 S.Ct. 1044 ("We can stay far off that difficult terrain, however"). However, *Rice* noted the difficulties attending any determination that native Hawaiians constitute a tribe. *Id.* at 518, 120 S.Ct. 1044. On this Motion, Plaintiffs have the burden of persuading this court that Plaintiffs are likely to succeed on the merits. While the court acknowledges that Plaintiffs raise serious questions going to the merits of the issues they raise, the court cannot conclude that, on the present record, Plaintiffs show a likelihood that they will succeed in establishing that "strict scrutiny" is the applicable standard governing the alleged racial discrimination. They therefore fail to demonstrate that they are likely to prevail on the merits.[11]

■ To obtain a temporary restraining order, Plaintiffs must do more than raise serious questions as to the merits of their equal protection claims based on the expenditure of taxes. Plaintiffs must also show that the balance of hardships tips in their favor. Although no specific expenditure of taxpayer money has been identified for the court on this motion, the court can foresee that an injunction precluding such an expenditure would conceivably endanger programs on which many people, both native Hawaiian and otherwise, depend. Without reviewing the exact nature of each such expenditure, Plaintiffs cannot demonstrate that the balance of hardship tips in their favor. The present record does not contain the necessary material to determine that the balance of hardships tips decidedly in Plaintiffs' favor.

### B. *Public Trust Doctrine Claims.*

Besides raising the equal protection claims discussed above, Plaintiffs bring

---

**10.** In *Morton,* the Supreme Court found that employment preferences given to qualified American Indians in the Bureau of Indian Affairs ("BIA") did not constitute "racial discrimination." *Morton,* 417 U.S. at 553, 94 S.Ct. 2474. The Court based this holding on "the unique legal status of Indian tribes under federal law," as well as the plenary power of Congress under Article I, § 8, cl. 3 (providing Congress with the power to regulate Commerce with the Indian tribes), to deal with the problems of Indians. *Id.* at 551–52, 94 S.Ct. 2474. The preference was therefore not granted to American Indians as a discrete racial group, but, instead, "as members of quasi-sovereign tribal entities whose lives and activities are governed by the BIA in a unique fashion." *Id.* at 554, 94 S.Ct. 2474. The Court therefore only applied a "rational basis" test to determine that the preference was constitutional. *Id.* at 555, 94 S.Ct. 2474 ("As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligations toward the Indians, such legislative judgments will not be disturbed").

**11.** The court notes that the resolution of whether strict scrutiny or rational basis review is applied turns on whether native Hawaiians are a "tribe." This issue may raise a political rather than purely legal question. In any event, this court need not resolve this matter on this Motion.

claims as beneficiaries of a public land trust. The Ninth Circuit has held that native Hawaiians, as beneficiaries of a public land trust created by section 5(f) of the Admissions Act, have standing to challenge Hawaii's alleged breach of its trust obligations based on an alleged failure to use that public land trust for the betterment of the conditions of native Hawaiians.[12] *Price I,* 764 F.2d at 630. *Accord Price V,* 3 F.3d at 1224. The Ninth Circuit has recognized that beneficiaries of such a trust "have the right to 'maintain a suit (a) to compel the trustee to perform his duties as trustee; (b) to enjoin the trustee from committing a breach of trust; [and] (c) to compel the trustee to redress a breach of trust.'" *Price V,* 3 F.3d at 1224 (citing Restatement (Second) of Trusts, § 199).

Plaintiffs say that they are beneficiaries of a public land trust similar to the one created by section 5(f) of the Admissions Act. At the hearing, Plaintiffs clarified that their breach of the public land trust claim is based on an alleged public land trust created by the Newlands Resolution of 1898. Plaintiffs read this Resolution as permitting use of the land ceded to the United States in 1898 only "for the benefit of the inhabitants of the Hawaiian Islands for educational and other public purposes." *See* 30 Stat. 750. Plaintiffs argue that the "inhabitants" who are the beneficiaries of the alleged 1898 Newlands Resolution trust are not restricted to native Hawaiians or Hawaiians. As there were people of many races living in Hawaii in 1898, Plaintiffs argue that the "inhabitants" who are the beneficiaries of this purported trust include people of all races, and that all Plaintiffs therefore are beneficiaries of the alleged 1898 Newlands Resolution trust.

In enacting the HHCA and the Admissions Act, Congress set forth the purposes for which the proceeds of the lands were to be used. Among these enumerated purposes was "the betterment of the conditions of native Hawaiians." Plaintiffs contend that the continuing application of these acts "for the betterment of the conditions of native Hawaiians" not only violates the Equal Protection Clause, it also impermissibly departs from the terms of the alleged 1898 Newlands Resolution trust. It is this departure that is at the heart of Plaintiffs' breach of trust claim.

 The nature of Plaintiffs' attack on this departure is far from clear. Plaintiffs appear to be arguing that the federal government breached the 1898 Newlands Resolution trust in 1920 and 1959, when the federal government imposed requirements relating to use of trust assets for Hawaiians and/or native Hawaiians. Plaintiffs do not show they have standing to bring this claim. While they may indeed be parties injured by the alleged breach, and while their injury may be traceable to the alleged breach, they do not show that their injury is likely to be redressed by a favorable decision. *See Lujan,* 504 U.S. at 560–61, 112 S.Ct. 2130 (to have standing a plaintiff must show an injury in fact, a causal relationship between the injury and the challenged conduct, and a likelihood that a favorable decision will redress the alleged injury).

The alleged breach was committed by the federal government in 1959, at the

---

**12.** The Ninth Circuit has concluded that section 5(f) of the Admissions Act creates a right enforceable under 42 U.S.C. § 1983, *Keaukaha–Panaewa Community Ass'n v. Hawaiian Homes Commn.,* 739 F.2d 1467, 1472 (9th Cir.1984), even though it creates no private cause of action. *Price I,* 764 F.2d at 631. In

*Keaukaha–Panaewa,* the Ninth Circuit relied on a principle enunciated in *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), that the lack of an implied right of action in a federal court does not foreclose private actions under § 1983. *See Keaukaha–Panaewa,* 739 F.2d at 1471.

latest. Since that time, the federal government has not imposed or enforced any trust requirements, has not implemented any trust programs, and has not administered any trust assets or services. The court has some difficulty understanding how, in 2002, a court can hold the federal government to account for allegedly illegal laws it enacted decades ago from which it has long since divorced itself. What remedy could this court order against the federal government when it is now the State, not the federal government, that controls the programs and assets about which Plaintiffs complain? It appears to the court that, if Plaintiffs have any remedy for the alleged wrongdoing by the federal government, that remedy lies with another branch of government.[13]

 Plaintiffs may be alternatively claiming that the State, HHC, DHHL, and OHA are violating the Equal Protection Clause by continuing to apply the HHCA and the Admission Act "for the betterment of the conditions of native Hawaiians." The problem with such a claim is that Plaintiffs raise it in Plaintiffs' capacity as purported trust beneficiaries suing for mismanagement of a public trust. A claim for mismanagement of a public trust must involve some deviation from the terms of the trust. *See Price V*, 3 F.3d at 1224. Plaintiffs, however, are complaining that trustees are complying with express trust requirements that trust assets be used for the betterment of native Hawaiians. Far from alleging that these trustees are violating the terms of the trust as set forth in the HHCA and the Admission Act, Plaintiffs are arguing that the trustees should ignore certain terms of those laws and instead comply with what Plaintiffs allege

is the "true" trust created in 1898 by the Newlands Resolution. The present trustees, however, were never trustees of the 1898 Newlands Resolution trust. The present trustees are charged with enforcing the present trust, which is a modified version of what was in effect in 1898. Plaintiffs' claim turns out to be an attempt to have the present trustees ignore the modifications, on the ground that they violate the Constitution. This is not a claim that a trust beneficiary may pursue on trust mismanagement grounds.

Defendants view the problem with Plaintiffs' breach of trust claim as one of standing. It is not clear to this court that the problem is a lack of standing, as opposed to a failure to state a claim. Regardless of whether this matter is better viewed under Rule 12(b)(1) or Rule (b)(6), the court, on the present record, is not persuaded that Plaintiffs may pursue their breach of trust claim in their capacities as purported trust beneficiaries.

This is not to say, of course, that Plaintiffs have no avenue for claiming that Defendants are violating the Equal Protection Clause by applying the HHCA and the Admission Act. As the court noted in connection with Plaintiffs' equal protection claims, claims may still be brought by parties who suffer actual discrimination. Plaintiffs could, for example, apply for benefits, and, if turned down on the basis of race, possibly assert standing on the basis of such a denial. This possibility was discussed by Chief Judge David Ezra in the consolidated cases of *Carroll v. Nakatani*, Civil No. 01–00641 DAE/KSC, and *Barrett v. Hawaii*, Civil No. 01–00645 DAE/KSC. Beneficiary status, by con-

---

**13.** Although Chief Judge David Ezra recently stated that the "United States is an indispensable party to any successful challenge to the lease provisions of the HHCA," *see Carroll v. Nakatani*, 188 F.Supp.2d 1219 (D.Haw.2001), he did not rule that, if the United States had been joined as a party, this court could then order any remedy against the federal government for having promulgated the HHCA or the Admission Act.

trast, concerns attempts to compel compliance with the terms of the trust that the trustees are charged with administering.[14] Plaintiffs appear to be trying to require the present trustees to deviate from present trust terms and instead to implement the terms of the alleged 1898 Newlands Resolution trust, which Plaintiffs see as the only "true" trust.

Because this issue is likely to be the subject of further proceedings, the court also notes that it is concerned that the Newlands Resolution may not have actually created the trust alleged by Plaintiffs. Plaintiffs claim that this trust only allows the land ceded to the United States in 1898 to be used "for the benefit of the inhabitants of the Hawaiian Islands for educational and other public purposes." *See* 30 Stat. 750. Plaintiffs, however, cite no binding authority that directly supports the proposition that a public land trust was established by that Resolution. At most, Plaintiffs cite an opinion by the Attorney General. *See* Ex. AA. However, that opinion does not conclude that a public land trust governing management and disposition of the land was created by the Newlands Resolution.

After accepting the cession of crown, government, and public lands in the Newlands Resolution, Congress stated that it would

enact special laws for their management and disposition: *Provided,* That all reve-

nue from or proceeds of the same [with exceptions] ..., shall be used solely for the benefit of the inhabitants of the Hawaiian Islands for educational and other public purposes.

30 Stat. 750. The Newlands Resolution therefore placed restrictions on revenue and proceeds from the public lands. As recognized by the Attorney General opinion cited by Plaintiffs, however, this restriction did not affect the previous clause, which conferred upon Congress the power to manage and dispose of the lands. *See* Ex. AA at 576.

 Even assuming that a public land trust was created by the 1898 Newlands Resolution, Plaintiffs have not demonstrated that Congress exceeded its power to manage *or* dispose of the ceded lands through the HHCA or the Admission Act. Nor have Plaintiffs demonstrated that the betterment of the conditions· of native Hawaiians is not a "public purpose" for which the Newlands Resolution would allow use of the revenue and proceeds derived from the ceded land.[15] Accordingly, Plaintiffs have failed to demonstrate that they are likely to succeed on the merits of their public land trust claim. Even assuming that Plaintiffs raise serious questions as to those merits, the balance of hardships appears to favor Defendants. *See, e.g.,* Declaration of Jobie M.K.M. Yamaguchi (undated but filed as part of

---

**14.** Citing *Pennsylvania v. Board of Directors of City Trusts of Philadelphia,* 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792 (1957), Plaintiffs additionally argue that the government, while acting as trustee of a land trust, cannot enforce privately created racial classifications. However, on this motion, Plaintiffs fail to demonstrate standing to make this argument. *Pennsylvania,* 353 U.S. 230, 77 S.Ct. 806, 1 L.Ed.2d 792, involved plaintiffs who claimed to have been victims of actual discrimination, as opposed to trust beneficiaries claiming mismanagement of the trust.

**15.** At the time the HHCA was passed, for example, Congress noted that the HHCA was to "rehabilitate the native Hawaiian population," which it characterized as a "dying race." *see* H.R.Rep. No. 839 at 2 (1920). Congress indicated that, since the institution of private ownership of lands in Hawaii, the native Hawaiians (outside the King and the chiefs) "were granted and have held but a very small portion of the lands of the Islands." *Id.* at 6. The report noted that the "Hawaiians are not business men and have shown themselves unable to meet competitive conditions unaided." *Id.*

State's Opposition) (discussing the hardships that a restraining order on the HHC and DHHL would cause).

Given all of the court's concerns, a TRO is not warranted based on Plaintiffs' public land trust theory of the case.

## V. CONCLUSION.

For the foregoing reasons, Plaintiffs' motion for a temporary restraining order is denied. The HHA Intervenors' motion to intervene is granted.

IT IS SO ORDERED.